Estrada *v.* Murphy.

## ESTRADA *et al. v.* MURPHY *et als.*

WHERE land is held by an imperfect or merely equitable title under a Mexican colonization grant in the usual form, requiring approval of the Departmental Assembly and juridical possession from the magistrate of the vicinage, and being for a certain quantity of land within exterior limits embracing a much greater amount, such grant must have been presented to the United States Board of Land Commissioners for confirmation, or it will be deemed as abandoned, and be treated by the Courts as nonexistent, whatever may have been its original validity; and the land, so far as a party claiming under the unconfirmed grant is concerned, will be regarded as public land of the United States.

Whatever doubts may exist as to the validity of the legislation of Congress, so far as it requires the presentation to the Board of claims where the lands are held by perfect titles acquired under the former Government, there can be none as to the validity of the requirement with respect to claims where the lands are held by imperfect or merely equitable titles.

The doctrine of *Waterman* v. *Smith*, (13 Cal. 411) that in the case of an imperfect grant of a certain quantity of land within exterior limits containing a much larger quantity, the interest of the grantee attaches to no definite portion of the tract, until such portion has been measured and segregated by official authority, and that the right to thus segregate belongs solely to the Government and cannot be exercised by the grantee, at least so as to bind the Government; and of *Teschemacher* v. *Thompson*, (18 Cal. 12) that the possession of this right imposes on the Government of the United States the duty of exercising it so as to protect the interest of the grantee; and that this duty or obligation is political in its character, and hence can be discharged at such times and upon such terms as the Government may deem expedient, recognized and affirmed.

The Act of March 3d, 1851, to ascertain and settle private land claims in California, was passed to enable the Government to execute its treaty obligations, and to ascertain what were public lands. By that act the Government has announced the conditions upon which it will discharge its political duties to Mexican grantees, and at the same time separate and distinguish their rights from the public property. It has there required all claims to land to be presented within two years from the date of the act, and declared in effect, that if upon such presentation they are found by the tribunal established for their in-

vestigation, and by the Courts on appeal, to be valid, it will take such action
as will result in rendering them perfect titles. But it has also declared, in
effect, by the same act, that if claims constituting only interests in land,
requiring measurement and segregation from the public domain, be not thus
presented, it will take no action for their protection, and the claims will be
considered and treated as abandoned. Legislation of this character is not sub-
ject to any constitutional objection.

The fact that land claimed under a Mexican grant has been confirmed to A, who
presented his claim under the grant, and that therefore such land is private
land as to A, does not make the land private land as to B, who claims under
the grant, but never presented his claim to the Land Commissioners for con-
firmation. As to him, the land is public land.

The Act of March 3d, 1851, does not mean that whenever a claim under a grant
is not presented, the land shall be deemed absolutely a part of the public
domain, but that it shall be thus treated so far as any right of the particular
claimant is concerned. Other parties may have successfully asserted claims
to the same land, with reference to whom it would be held as private property.

The confirmation under the act operates to the benefit of the confirmee, and par-
ties claiming under him, so far as the legal title to the premises is concerned.
It establishes the legal title in the confirmee, and this must control in the
action of ejectment.

If the confirmee in presenting his claim, acted as agent, or trustee, or guardian, or
in any other fiduciary capacity, a Court of equity, upon a proper proceeding,
will compel a transfer of the legal title to the principal, *cestui que trust*, ward,
or other party equitably entitled to the same, or subject it to the proper trusts
in the confirmee's hands. It matters not whether the presentation were made
by the confirmee in his own name in good faith, or with intent to defraud the
actual owner of the claim: a Court of equity will control the legal title in his
hands so as to protect the just rights of others. But in ejectment the legal
title must control.

An answer in ejectment setting up an equitable defense is in the nature of a bill
in equity, and must contain its essential averments. The defendant then be-
comes an actor with respect to the matter alleged by him, and his defense
must be of such a character as may be ripened by the decree of the Court into
a legal right to the premises, or as will estop the prosecution of the action of
the plaintiff. The equitable defense is, therefore, first to be passed upon by
the Court, and until it is disposed of, the assertion of the legal remedy is in
effect stayed. Upon the determination of the Court upon the relief prayed by
the answer, the necessity of proceeding with the action at law will depend.
When it does proceed the legal title will control its result.

The holder or assignee of a grant, issued by a California Governor without ap-
proval by the Departmental Assembly or juridical possession, cannot, in an
ordinary action of ejectment, recover against the confirmee of the Federal
Government having an approved survey.

*Semble,* from the case of *Castro* v. *Hendricks* (23 How. 441) and other cases in the
Supreme Court of the United States, that the mere fact that a particular per-
son obtained a patent from the Government was not conclusive of his ex-

17

clusive right; but that it might be shown, *in a proper proceeding*, that others were interested or had the better right.

APPEAL from the Third District.

This is an ordinary action of ejectment for the recovery of the possession of the Rancho lying in Santa Clara county, granted under the name of *Pastoria de las Borregas.*

The plaintiffs allege that they are seized in fee of the premises, and are entitled to the possession of the same.

Defendant Murphy, as to whom alone there is any contest, filed an answer, which, after a general denial, averred in substance that on or before March 12th, 1856—the date of plaintiffs' alleged seizin —he was and thence hitherto has been and now is seized and possessed in fee of a portion of the premises—describing them by metes and bounds, and disclaiming possession or title to any other portion; that he holds said land in good faith and under color of title adversely to the alleged title of plaintiffs, and without notice or knowledge of plaintiffs' claim, and has put valuable and permanent improvements thereon worth $75,000. The answer also sets up the Statute of Limitations of five years.

On the trial, the following facts were agreed to and read in evidence :—

1. That on the fifteenth day of January, A. D. 1842, the Mexican nation, by Juan B. Alvarado, Governor of California, duly granted to Francisco Estrada, the Rancho and land known by the name of " Pastoria de las Borregas," bounded as described in said grant on file in the Surveyor General's office of the United States for the State of California, a duly certified copy of which plaintiffs or defendants may read in evidence without proof of the original.

2. That the said Francisco Estrada, grantee, died in California, on the third day of March, A. D. 1842, intestate, unmarried and without descendants, leaving surviving him his father, Jos. Mariano Estrada, who was his sole heir, and inherited the said Rancho so as aforesaid granted, and succeeded to the rights therein of said original grantee.

3. That the said Jos. Mariano Estrada died on the sixth day of November, 1847, in California.

4. That the land of which Martin Murphy is in possession is within the exterior limits of the said grant.

5. That the land of which the said Martin Murphy is in possession is correctly described in his answer in this action, and has been finally confirmed to the said Martin Murphy (and to no other person) under the Act of Congress of March 3d, 1851, and of the Act of the thirty-first of August, 1852, supplementary to and amendatory thereof, and is described in the final decree of confirmation as in said answer; and in three several mesne conveyances; [first] dated Jan. 8th, 1851, from Mariano Castro and wife to said Martin Murphy; second dated April 21st, 1851, from said Mariano Castro to said Martin Murphy; third dated April 14th, 1854, from said Castro to said Murphy, which deeds were duly executed and may be read in evidence without further proof, and the plaintiffs admit the existence and due execution of the powers of attorney under which the same were executed, and waive the production thereof on the trial.

6. That neither the plaintiffs, nor any person under whom they claim the lands described in the complaint, ever presented to the United States Board of Land Commissioners, under said Act of Congress, any claim to said Rancho, or any part thereof; nor has any part thereof been confirmed to plaintiffs, their ancestor, or grantors; that the only claims ever presented to said Board under said grants were presented by said Martin Murphy, and by said Mariano Castro, his grantor, separately.

7. That the land as aforesaid, confirmed to the said Martin Murphy, was duly surveyed by the United States Surveyor General for the State of California, pursuant to the Acts of Congress and according to the lines described in said deeds and decree of confirmation, and said survey approved by said Surveyor General prior to the first day of December, A. D. 1859.

8. That the said grant to the said Francisco Estrada was for two square leagues of land, and that there is within the exterior limits described in said grant a greater quantity, to wit: between three and a half and four leagues of land."

With the stipulation admitting the above facts, the parties re-

served to themselves the right to introduce any other competent testimony pertinent and material to the issues in the cause.

In addition to this stipulation, the plaintiffs introduced a copy of the grant, as follows:

"*Juan B. Alvarado, Constitutional Governor of the Department of Californias:*

"Whereas, Don Francisco Estrada has sought to obtain for his personal benefit and that of his family, the tract of land known by the name of Pastoria de las Borregas, bounded by the tract of Don José Peña on the side of Sansal de las Borregas, by the Rancho of Don Prado Mesa, and by the Laguna, situated at the Punta del Roblar, having previously performed the inquiries and investigations relating thereto, according to the provisions of the laws and regulations, using the powers which are conferred on me, in the name of the Mexican nation, I have conceded to him the said tract of land, declaring to him the ownership thereof by these present letters, subject to the approbation of the Most Excellent Departmental Council, and under the following conditions:

"1st. He may enclose it without injuring the crossings, roads and thoroughfares; enjoy it freely and exclusively, applying it to the use or cultivation that may suit him best, but within one year he shall build a house, and it shall be inhabited.

"2d. He shall solicit the proper Judge to give him juridical possession by virtue of this dispatch, whereby the boundaries shall be demarked, in the limits of which he shall put, besides the landmarks, some fruit or useful wild trees.

"3d. The land of which donation is made is of two sitios de ganado mayor, a little more or less, as shown by the plat which goes annexed to the expediente. The Judge giving the possession shall cause it to be measured according to ordinance, the surplus to remain for the proper use of the nation.

"4th. If he contravene these conditions, he will lose his claim to the land, and it shall be denounceable by another.

"Wherefore I order that this title being held as firm and valid, an entry be made of it in the proper book, and it be delivered to the party interested for his safety and other purposes.

"Given at Monterey, the fifteenth day of January, 1842.

"MANUEL JIMENO, Secretary."          "JUAN B. ALVARADO.

Estrada *v.* Murphy.

" Account is taken of this title in the book of registry on adjudications of the vacant lands at page nine.

"JIMENO."

" His Excellency, Señor Governor, has directed an account to be taken of this concession in the office of the Prefect of the First District.                                                            JIMENO."

"MONTEREY, 16th January, 1842.

" Let an account be taken.                                ESTRADA."

"Account is taken of this superior title at page four of the proper book.

" Office of the Prefect of the First District, Monterey, sixteenth of January, 1842.                          MAN'L CASTANARES, Sec'y."

Also the will of José M. Estrada, to show the devise to Santiago Estrada, and a deed of bargain and sale from Santiago, as devisee, to the plaintiffs.

[TRANSLATION OF THE WILL.]

" In the name of God Almighty and of the Most Holy Trinity, Father, Son and Holy Ghost, three distinct persons, and one only true God.    I being on bed, grievously sick, but in my entire judgment, and fearful of death, which is natural in all men, in order to discharge my conscience, establish this testament informally on account of not having opportunity to de it judicially, declaring : First. That I have been baptised in the bosom of the Most Holy Church Catholic, Apostolic and Roman.    I believe as I formerly believed in the most exalted dignity of the Most Holy Trinity ; in the mystery of the incarnation of the Son of God ; in the pure womb of Mary ever Virgin.    I commend my soul to God who created and formed it from nothing, and my body to the earth, from which it was formed.

" I declare that I recognize as my property the house situated in Monterey, which formerly belonged to my deceased son, José Ramon, excepting the part of the court yard which faces the front of the house of Don Juan Malarine, from the north side, and the same width of the house of Don Manuel Diaz, to the wall of the Padra Real, which I have already sold to Don David Spence. Also, I declare that I have two hundred head of cattle in the pos-

session and on the rancho of my son Julian, and a band of cattle in possession of Don Manuel Diaz, which will be seen by a contract executed between him and me for the part of the Rancho of Buena Vista, called El Slaño, of which he has now entered into possession.

"Also, I declare that the Mexican Government owes me twenty-nine thousand dollars, the documents proving which will be found among my papers. It is my will, when they are recovered, that they shall be divided equally among my sons and daughters.

"Also, I declare that I owe to Don Euligo de Celez the sum of six hundred dollars, and it is my will that they be paid out of the cattle which Don Manuel Diaz should deliver.

"Also, I declare it to be my will, that after all my funeral expenses are paid, and two hundred more in masses for the welfare of my soul, and a thousand dollars to the Church for tithes in arrears, the which thousand dollars should be derived from the aforesaid house in Monterey, the remainder of my property shall remain entirely to the benefit of the family of my son Santiago, excepting a hundred head of cattle to remain to my son Julian for the expense and trouble he has been to.

"And in order to carry into effect this my last will, I name as my Executor Don David Spence. Monterey, October the thirtieth, one thousand eight hundred and forty-seven.

(Signed)        " José Mº ESTRADA.

" Witnesses : Rafael Sanchez, Santiago Watson, F. Maurdra—, Salvador Munrs, Jacinto Rodriquez, Antonio Mª Osio, Pedro Estrada.

No evidence was introduced by the defendants, except so far as the clauses after the fourth in the stipulation, which were read at their request, are legally their evidence.

The Court then granted a nonsuit, upon the ground substantially, that the plaintiffs had proved no title in themselves, by not having presented their claim for confirmation ; but that the title was in the defendant Murphy, by confirmation and survey ; and that if such confirmation had been fraudulently obtained, the remedy was by bill to compel Murphy to transfer the title to the plaintiffs, and not by ejectment.

The following are the eighth and part of the thirteenth sections of the Act of Congress of March 3d, 1851, entitled " An Act to ascertain and settle the private land claims in the State of California :"

" SEC. 8. *And be it further enacted,* That each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican Government, shall present the same to the said Commissioners when sitting as a Board, together with such documentary evidence and testimony of witnesses as the said claimant relies upon in support of such claims ; and it shall be the duty of the Commissioners, when the case is ready for hearing, to proceed promptly to examine the same upon such evidence, and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim, and within thirty days after such decision is rendered to certify the same, with the reasons on which it is founded, to the District Attorney of the United States in and for the district in which such decision shall be rendered.

" SEC. 13. *And be it further enacted,* That all lands, the claims to which have been finally rejected by the Commissioners in manner herein provided, or which shall be finally decided to be invalid by the District or Supreme Court ; and all lands, the claims to which shall not have been presented to the said Commissioners within two years after the date of this act, shall be deemed, held and considered as part of the public domain of the United States."

Plaintiffs appeal.

*Gregory Yale,* for Appellants.

I.   The Mexican grant, under which the plaintiffs claim, is sufficient legal title in itself to maintain an action to recover the possession of so much of the granted premises as Murphy admits that he occupies.   (*Ferris* v. *Coover,* 10 Cal. 614 ; *Manson* v. *Koppikus,* 11 Id. 89 ; *Morton* v. *Folger,* 15 Id. 276 ; *Seward* v. *Malotte,* Id. 307.)

II.   The failure of those under whom the plaintiffs claim to present the grant for confirmation under the Act of March 3d, 1851, cannot affect their right to recover.

If our first position be correct, then this second proposition necessarily follows, unless there is something in the Act of March 3d, 1851, divesting plaintiffs' title under the grant.  Respondents contend that the failure of Santiago Estrada and plaintiffs to present their claim to the United States Board of Land Commissioners for confirmation, works an absolute bar to their assertion of title.  This is not so.  The penalty or sanction of that part of the thirteenth section of the act, which declares that all lands, the claims to which shall not have been presented to the Board, " shall be deemed, held and considered as part of the public domain of the United States," is, that the Government, for its own purposes, connected with the land offices, will treat the land as public, unless a private claim is set up to it.  But if that private claim has not been set up by plaintiffs, and yet the Government does not treat it as public land, but has declared another to be the owner, under a grant, the plaintiffs are not prevented from asserting title to the land against such person.  The penalty of the act is not visited upon plaintiffs. In short, to reject plaintiffs' title because they have not presented their claim for confirmation, the Court must hold that they have no title, because the land is _public_ land ; and this would be absurd, for the reason that the United States have already declared it to be private land, by confirming it to defendant Murphy.  By confirming the land to defendant or any third person, the United States disclaim title, and the effect of that part of the thirteenth section under consideration is inoperative.

The correctness of this position will further appear from an examination of the former legislation by Congress upon the subject of inquest upon private land claims ; and such examination embraces treaties, decisions upon the treaties, Acts of Congress, and decisions thereon :

1st.  Treaties :  (That of 1780 between Virginia and Pennsylvania respecting boundaries ; Treaties with Great Britain, 1783 and 1794, 8 Stat. 83, 122; Compact with Georgia, 1802; Treaty of San Lorenzo el Rael, with Spain, in 1795 ; Treaty with France, 1803, 8 Stat. 202; Florida Treaty, 1819, art 3, 8 Stat. 258, art. 8 ; Treaty with Great Britain relative to the North-Eastern Boundary, 1842, 8 Stat. 574–5, art. 4 ;  also, Treaty of 1846 as to North-

Estrada v. Murphy.

western Boundary, 6 Stat. 879, arts. 3, 4; Treaty of Guadalupe Hidalgo, 1848, 9 Stat. 929, art 8; Treaty with Mexico acquiring Arizona, 1854, 10 Stat. 1035, art. 5; Treaty with Great Britain, 1814, art. 8, 8 Stat. 222).

2d. Decisions upon these treaties, so far as they relate to the protection and security of private property, as applicable to the question of the forfeiture of this title. (*Henderson* v. *Poindexter*, 12 Wheat.; 3 Dal. 456; *Higginson* v. *Mein*, 4 Cr. 415; *Orr* v. *Hodgson*, 4 Wheat. 463; *Society, etc.* v. *New Haven*, 8 Id. 466; *Harcourt* v. *Gaillard*, 12 Id. 523; *Hickey's Lessee* v. *Stuart*, 3 How. 756; *La Roche* v. *Jones*, 9 Id. 167; *Soulard's case*, 4 Pet. 511; *Delassus' case*, 9 Id. 133; *City of New Orleans* v. *Armas*, Id. 233; *Foster* v. *Neilson*, 2 Id. 253; *Percheman's case*, 7 Id. 399; 8 Id. 445; *Polk's Lessee* v. *Wendall*, 9 Cr. 100.)

3d. Acts of Congress relating to the confirmation of foreign grants, actual or supposed, in which Governors of Territories, and the Registers and Receivers of Land Offices were authorized either to confirm claims or to report upon them.

4th. Acts conferring similar powers upon Commissioners.

5th. Acts conferring jurisdiction upon the Courts in these cases originally, or by appeal. (Act of May, 1795, for disposition of public lands in territory north-west of the Ohio, 1 Land Laws, 7, 11, 13–14; Ordinance of July 13th, 1787, for government of said territory, Id. 22, sec. 3; Act of March 3d, 1791, granting lands to inhabitants and settlers at Vincennes, etc., 1 Stat. 221; Act of August 18th, 1856, 11 Stat. 140; 1 Stat. 549; Act of May 10th, 1800, 2 Stat. 69; Act of March 3d, 1803, 2 Stat. 229; Act of March 27th, 1804, 2 Stat. 303; Act of February 28th, 1809, 2 Stat. 526; Act of March 26th, 1804, 2 Stat. 277, as to Indiana Territory; Louisiana Territory, 2 Stat. 283; Act of March 2d, 1805, 2 Stat. 324, sec. 4; Act of April 21st, 1806, 2 Stat. 391, sec. 3; Act of March 3d, 1807, 2 Stat. 440, secs. 5, 6, 8; Act of March 10th, 1812, 2 Stat. 691, sec. 1; Act of July 27th, 1813, 2 Stat. 807, secs. 1, 2, 4; Act of March 3d, 1819, 3 Stat. 528, sec. 1; Act of May 16th, 1826, 4 Stat. 168, sec. 1; Act of March 3d, 1831, 4 Stat. 492, sec. 6, incorporated in Act relating to California Land Claims of March 3d, 1851; Act

of July 4th, 1832, 4 Stat. 561, sec. 1; Act of February 6th, 1835, 4 Stat. 749, sec. 1; Act of March 3d, 1823, 3 Stat. 756, secs. 1, 2, as to titles in Louisiana; Missouri, Act of April 12th, 1812, Act of June 13th, 1812, 2 Stat. 748, secs. 1, 7; Act of March 3d, 1813, 2 Stat. 812, secs. 1, 2 ; Act of August 2d, 1812, 3 Stat. 86, secs. 1, 2; Act of April 12th, 1814, 3 Stat. 121, sec. 1; Act of July 4th, 1836, secs. 1, 4, 5 Stat. 126; Act of May 26th, 1824, secs. 1, 2, 5, 6, 7, 4 Stat. 52–6; Mississippi Territory, Act of March 2d, 1805, sec. 5, 2 Stat. 223; Alabama, Act of March 3d, 1827, sec. 1, 4 Stat. 239; Act of March 2d, 1829, secs. 4, 6 4 Stat. 358; Florida Territory, Act of May 8th, 1822, secs. 1, 4, 5, 3 Stat. 709; Act of March 3d, 1823, sec. 5, 3 Stat. 854; Act of February 8th, 1827, secs. 1, 2, 4 Stat. 202; Act of May 23d, 1828, secs. 3, 4, 6, 7, 12, 13, 4 Stat. 284; Act of May 26th, 1830, secs. 1, 2, 6, 9, 4 Stat. 405; California, Act of March 3d, 1851, secs. 8, 11, 13, 15, 9 Stat. 631; New Mexico, Act of July 22d, 1854, sec. 8, 10 Stat. 313 ; Act of August 18th, 1858, 11 Stat. 140.)

The foregoing series of acts exhibits the different systems adopted by Congress to ascertain the public from private lands.   This was the object—the motives being : 1st, the treaty obligation to recognize private rights ; 2d, the disposal of the residue.   It is evident that the settlement of conflicting claims between different claimants does not enter into the motive, and cannot be within the scope of this legislation.   When the Government once parts with its interest to the particular tract of land, after ascertaining by some mode or other that it does not belong to the public domain, the object is accomplished.   The prominent feature, generally prevailing in these laws, is to require the claimant to make known his rights, for the action of the Government.   It has acted variously, through different classes of officers.   For a long time this action was not final, but preliminary to the action of Congress ; and when final, for another period, was only so against the Government, but not against the claimant.   No strictly judicial action was had, under these laws, till the Act of 1824, when Courts were empowered to make the investigation.

6th.   Decisions upon the foregoing acts.   (*Harcourt* v. *Gaillard*

Estrada v. Murphy.

and *Henderson* v. *Poindexter*, 12 Wheat.; *Hicks' Lessee* v. *Stewart*, 3 How.; *La Roche* v. *Jones*, 9 Id.; *Percheman's case*, 7 Pet. 51; 6 Id. 721; *Clark's cᵢ ᵢe*, 8 Id. 436; *Mitchel's case*, Id. 9 716; *United States* v. *Powers' Heirs*, 11 How. 570; *Pillerin's case*, 13 Id. 9; *Raselin's case*, 15 Id. 23; *United States* v. *Reynes*, 9 Id. 153; *Choteau* v. *Eckhart*, 2 Id. 344; *United States* v. *King*, 3 Id. 773; *Doe* v. *Esclava*, 9 Id. 421; *Le Bois* v. *Bramell*, 4 Id. 449; *Barry* v. *Gamble*, 3 Id. 32; *Strother* v. *Lucas*, 12 Pet.; *Burrill* v. *Penrose*, 8 How.; *Stoddard* v. *Chambers*, 2 Id. 284; *Sutter's case*, 21 Id.; *Landes* v. *Brant*, 10 Id. 348; *De la Croix* v. *Chamberlain*, 12 Wheat. 599; *Willot* v. *Sandford*, 19 How. 79; *Marvin's case*, 3 Id. 620; *Doe* v. *Latimer*, 2 Florida, 71; *Jones* v. *McMasters*, 20 How.; *Gunn* v. *Bates*, 6 Cal. 271; *Burgess* v. *Gray*, 16 How. 48; *McPherson* v. *Gregory*, 13 Cal. 571.)

The above decisions establish: 1st, that a claim not presented is in no worse condition than one rejected; 2d, that if under the law there is no jurisdiction—that is the strong term of the Court—to investigate or pass upon adverse rights directly, there is none incidently. The conclusion is, that a claim not presented is to be deemed and considered as a part of the public domain, under the fifteenth section of the Act of 1851, "for the purposes of the act," and nothing more. No case or *dictum* can be found to the contrary in regard to valid titles of foreign origin.

The California grants are like the Florida grants, which conveyed title, and were within the terms of the treaty, and above it under the law of nations. They do not, like the imperfect grants provided for in the treaty of 1803, require confirmation, or the exercise of political action, to impart a *status* in either Courts of law or in equity. They may be recognized, as perfect titles were by the Government under France and Spain, whether the recognition be called confirmation or by any other name. But they exist without the confirmation. In the language of the Chief Justice in *Gunn* v. *Bates*, as applied to perfect titles, as he then understood them, the owner "was fully protected, both by the laws of Mexico and the laws or usages of nations; as his title was not, neither could be divested by the treaty or any subsequent Act of Congress." (6 Cal. 271.)

These distinctions point to the misconception of principles and confusion of cases which have characterized the opposition to this action.   The decisions on the Louisiana incomplete titles have been applied to our California grants, as belonging to the same class; and the obligation to perfect those titles, contained in the treaty of 1803, has been taken up and applied, as a condition precedent, to the validity of a California title; whereas, had no provision been made in the treaty, and no act passed upon the subject of Mexican grants, they would have been grants still, as they were before, and now are, but not the less so by reason of the treaty or the Act of Congress.

III.   The confirmation of the same grant to Murphy, for so much as he claims of the same land granted, is not conclusive of his title, as against the plaintiffs in this action.   (17 How. 558 ; *Seward* v. *Malotte,* 15 Cal. 307 ; *Ferris* v. *Coover,* 10 Id. ; *Doe* v. *Esclava,* 9 How. 421 ; *Doe* v. *City of Mobile,* Id. 451 ; *Fossatt's case,* 20 Id. 425 ; *Castro* v. *Hendricks,* 23 Id. 442 ; *Pollard's Lessee* v. *Hagan,* 3 Id. 224.)   As showing that the United States, in the various acts as to these private land claims, only intend to relinquish all their title, as proprietor, to the confirmee, and not to settle conflicting claims between individuals, see saving clauses and provisos in the following acts :

No. 1. To authorize a grant of lands to the French at Galliopolis, 3d March, 1795, 1 Stat. 443, sec. 5.   No. 2. For the amicable settlement of limits with Georgia, and the establishment of the Mississippi Territory, before the cession of Georgia, 7th April, 1798, 1 Stat. 550, sec. 5.   No. 3. To authorize the removal of intruders from public lands by military force, 3d March, 1807, 2 Stat. 445, sec. 1.   No. 4. Confirming land claims in Mississippi Territory founded on British and Spanish warrants of survey, June 30th, 1812, 2 Stat. 766, sec. 2.   No. 5. Confirming lands in the same Territory derived from the British Government of West Florida, and not regranted by Spain or the United States, July 5th, 1812, 2 Stat. 776, sec. 1.   No. 6. Confirming certain locations made by Commissioners for the Territory of Illinois under an Act of 1814, 27th February, 1815, 3 Stat. 219, sec. 7.   No. 7. Relating to the adjustment of land claims in Michigan, 21st Febru-

Estrada *v.* Murphy.

ary, 1823, 3 Stat. 725, sec. 3.    No. 8. To confirm claims to lots in
Peoria, Illinois, 3d March, 1823, 3 Stat. 786, sec. 1.    No. 9. Con-
firming decisions made by the Commissioners under the Acts of
1822–3, in Florida, before the Courts had jurisdiction by the Act
of 1828, 8th February, 1827, 4 Stat. 202.    No. 10. Congressional
confirmations in Florida, prior to the jurisdiction of the Courts, and
by the same act conferring it, May 22d, 1828, 4 Stat. 284.    No.
11. Providing for the final settlement of land claims in Florida,
May 26th, 1837, 4 Stat. 406.    No. 12. To investigate alleged
frauds under the preëmption laws, providing an agent for that pur-
pose with certain powers, 3d March, 1843, 5 Stat. 621, sec. 8.
No. 13. To adjust suspended preëmption claims in several States
and Territories, extending the same principies to conflicting claims
on public lands where there were no foreign grants, 23d May,
1844, 9 Stat. 51, sec. 1.    No. 14. To authorize the issue of
patents in cases where claims have been confirmed by laws mak-
ing no provision for patents upon the confirmations, 22d December
1854, 10 Stat. 599, sec. 1.    No. 15. To ascertain and adjust
titles to certain lands in Indiana, under the grants of the confed-
erated Congress in 1788, 18th August, 1856, 10 Stat. 314, sec.
7.    No. 16. For the location of twenty-five confirmed private
claims in Missouri, 2d June, 1858, 11 Stat. 294.    No. 17. For
the confirmation of twenty-two pueblos and towns in New Mexico,
22d Dec. 1858, 11 Stat. 374.

Similar provisions are found in the respective acts conferring
jurisdiction on Commissioners and Courts, already given.

Decisions upon these acts.    (*New Orleans* v. *Armas,* 9 Pet.
223 ; *Arredondo's case,* Id. 738 ; *Doe* v. *Latimer,* 2 Fla. ; *Cho-
teau* v. *Eckhart, Le Bois* v. *Bramell, Willot* v. *Sandford, supra;
Barry* v. *Gamble,* 3 How. 279 ; *McDonough* v. *Millaudon,* 3 Id.
693 ; *Patterson's case,* 15 Id. 10 ; *Ballance* v. *Forsyth,* 13 Id.
18 ; *Marsh* v. *Brooks,* 8 Id. 223 ; 14 Id. 513 ; *West* v. *Cochran,*
17 Id. 415 ; *Fossatt's case,* 20 Id. 425.)

IV.    The remedy of the plaintiffs is legal under these facts,
although an equitable remedy may exist.    (*Bright* v. *Eynon,* 1
Burr, 396, cited in 1 Hovenden, 16 ; 2 Hilliard on Vendors, ch. 42 ;
*Doe* v. *Esclava,* 9 How. 421 ; *Little* v. *State of Arkansas,* 22 Id.

193; *Comegys* v. *Vasse*, 1 Pet. 193; *Garland* v. *Wynn*, 20 How. 6; *Mezes* v. *Greer*, 1 McAll. 401; *Fosssatt's case*, 21 How. 445; *Percheman's case*, 7 Pet.; *Patterson's case*, 15 How. 10; *Sutter's case*, 21 Id. 182; *Cunningham* v. *Ashby*, 14 Id. 238; *Polk's Lessee* v. *Wendall*, 9 Cr.; *Castro* v. *Hendricks*, 23 How. 439; *Ross* v. *Barland*, 1 Pet. 655.)


*Patterson* and *Stow*, for Respondent.


I.   Plaintiffs were properly nonsuited, whether the Court regarded the facts as proven by plaintiffs or defendants, if in the opinion of the Court, taking the facts as true, a verdict for the plaintiffs could not be sustained.   (*Reed* v. *Davis*, 3 Hill, 387; affirmed in 7 Id. 529; *Fort* v. *Collins*, 21 Wend. 149; *Jansen* v. *Acker*, 23 Id. 480.)

II.   Admitting, for the sake of argument, that José Mariano Estrada had title at the time of his death, plaintiffs did not connect themselves with that title; they only claimed to do so under the following clause of his will: " The remainder of my property shall remain entirely to the benefit of the family of my son Santiago, excepting," etc.

This gave Santiago no estate or interest in the lands.   The clear intention of the testator was to exclude Santiago, and to devise for the benefit of his family, meaning his wife and children.   In *Barnes* v. *Patch*, (8 Ves. 604) it was insisted that the word "family" was a word of general signification, which, in common parlance, must comprise the wife and himself: Sir Wm. Grant.   " The only construction is, that by the word ' family,' children are meant.   (*Doe d Hayten* v. *Joinville et al.*, 3 East. 172.)

III.   The defendant Murphy relies upon the broad proposition, that the confirmation and survey to him is conclusive proof of title in him, and that the failure of Santiago Estrada and plaintiffs (who claim under him) to present for and to obtain confirmation of their title by the Board of United States Land Commissioners, under the Act of March 3d, 1851, etc., is an absolute bar to the assertion of title by plaintiffs.

The policy and legislation of Congress as to all land claims de-

rived from foreign or other Governments, has been uniform.    All have been subjected to examination and adjudication; or, to speak more correctly, to confirmation or rejection.    In California, however, (unlike the titles or claims in Florida, Louisiana and Orleans Territories) perfect as well as imperfect, complete as well as inchoate titles have been subjected to this test, and no distinction has been made between the most complete and perfect title and the faintest shadow of an equity.

1.  The grant to Estrada was for two leagues within the exterior limits of three and a half or four leagues; it was an incomplete and inchoate grant; in other words, was not a perfect title.    (*Waterman* v. *Smith*, 13 Cal. 408.)

" The limitation of quantity was a controlling condition of the grants in question, and the delivery of juridical possession was an essential ceremony under the Goverment of Mexico to perfect the title of the grantees to the specific quantity designated.    This was expressly held in the case of the *United States* v. *Fossatt* (20 How. 426).    Until such possession, which was accompanied by a survey, the title of the parties attached to no definite portion of the tract."

Again:  " This duty was discharged by the survey following the final confirmation, and from that time the title of the parties claiming under Solano became perfect."

" On the other hand, the title under the grant to Armijo did not attach to any three specific leagues; it constituted only an interest in such quantity, to be afterwards laid off by competent authority. Such general interest, not attached to the land in controversy, but by the action of the officers of the Government excluded from it, cannot be set up as a defense to the claim of the plaintiffs."

The language of the Statute of 1851 is, " each and every person claiming lands, etc., shall present the same," etc.    (Sec. 8.) "And for all claims finally confirmed, a patent shall issue to the claimant," etc.    (Sec. 13.)    Santiago Estrada was not a claimant, nor were plaintiffs.    No survey can or will be made by the United States to either as claimants, or under any decree of confirmation.

It is not the grant that is confirmed, it is the claim of the person

who " presents his claim." (See the order in *Fremont* v. *United States,* 176, " that the claim of the petitioner to the land, etc. * * is a good and valid claim ; " 6 Pet. 759 ; *Arredondo's case.*)

To quote again from *Waterman* v. *Smith* (419) : " The essential and substantive acts, under the Law of 1851, were the confirmation and survey."

Hence it follows that plaintiffs established no title to any specific quantity of land, and hence cannot maintain ejectment, at least as against respondent, having confirmed to him a specific quantity by metes and bounds, and surveyed to him under the Act of 1851.

2. The confirmation to Murphy, respondent, enures to his benefit exclusively ; and plaintiffs cannot avail themselves of it as a confirmation of the grant which enures to the benefit of any person deraigning title under the grantee. (*Strother* v. *Lucas,* 6 Pet. 763 ; *Harcourt* v. *Gaillard,* 12 Wheat. 528 ; *Chouteau* v. *Eckhart,* 2 How. 345 ; *Barry* v. *Gamble,* 3 Id. 32 ; *Les Bois* v. *Bramell,* 4 Id. 458 ; *Menard's Heirs* v. *Samuel Massey,* 8 Id. 293 ; *Hosner* v. *DeYoung,* 1 Texas, 764 ; 2 Id. 357 ; *Easton* v. *Salisbury,* 21 How. 526 ; *Ham* v. *State of Missouri,* 18 Id. 126 ; *Chouteau* v. *Mahoney,* Id. 203 ; Id. 96 ; *Pontalba et al.* v. *Copland,* 3 La. An. 86 ; *Purvis* v. *Harmanson,* 4 Id. 422 ; *Lobdell* v. *Clark,* Id. 99 ; *Hall* v. *Root,* 19 Ala. 378.)

In New York, military bounty lands were granted to soldiers, and patents were issued to the grantees, which was the highest evidence of title known to the law.

The Legislature on the eighth of January, 1794, enacted that all deeds and conveyances theretofore made and executed, etc., of such lands, should be deposited with the Clerk of the city and county of Albany, on or before May 1st, 1794, and if not delivered to and deposited, etc., should be adjudged fraudulent and void against the subsequent purchaser or mortgagee for valuable consideration. (See the Statute quoted at length, 6 Cowen, 137.) This Statute was upheld in *Jackson* v. *Harrington* (6 Cow. 135) ; *Jackson* v. *Hubbard* (1 Caines, 82) ; *Jackson* v. *Given* (8 John. 137) ; *Jackson* v. *Bowen* (6 Cow. 141) ; *Wendell* v. *Wadsworth* (20 John. 629). We can see no difference in the principle of this legislation and the Act of March 3d, 1851.

*Williams & Thornton,* also for Respondent.

I.   The Act of 1851 is a valid and constitutional act; and a failure to present any claim is followed inevitably by the consequences specified in the act.   This has been frequently held by the Supreme Court of the United States upon similar laws.   (*Strother v. Lucas,* 12 Pet. 448; *Barry* v. *Gamble,* 3 How. 55; *League* v. *De Young,* 11 Id. 202–3; *United States* v. *Fossatt,* 21 Id. 447–8; *Yturbide's Executors* v. *United States,* 22 Id. 291; *Hall* v. *Doe ex dem. Root,* 19 Ala. 336, 392–3.)

The bar imposed under similar acts has been uniformly enforced, both in the Federal and State tribunals.   (*Les Bois* v. *Bramell,* 4 How. 458; *McCabe* v. *Worthington,* 19 Id. 96; *Ham* v. *State of Missouri,* 18 Id. 126, 134; *Menard* v. *Massey,* 8 Id. 307, 310; *Easton* v. *Salisbury,* 21 Id. 426.)

The Courts have invariably, without exception, upheld all such laws, and so far as imperfect titles are concerned, we have never heard their constitutionality doubted.   The action of the political department of the Government in such cases is an absolute necessity.

It may be as well to inquire then, what is the character of the title involved in this controversy?   Is it a perfect or imperfect title?   The record shows that it was a grant of a specific quantity within exterior limits containing a much larger quantity, requiring a segregation, which was never had under the former Government, to attach the title to any specific parcel of land.   The title, therefore, is imperfect—inchoate.   To its completion some action of the political department, such as the Act of 1857 provides, is an absolute necessity.   (*Rutherford* v. *Green's heirs,* 2 Wheat. 196; *Fremont's case,* 17 How. 559; *West* v. *Cochran,* 17 Id. 416; *Willot* v. *Sanford,* 19 Id. 82; *Bryant* v. *Forsyth,* Id. 335; *Kissell* v. *St. Louis Public Schools,* 18 Id. 25; *Ledoux* v. *Black,* Id. 475; *Cooper* v. *Roberts,* Id. 179; *Balance* v. *Papin,* 19 Id. 343; *Menard* v. *Massey,* 8 Id. 293; *United States* v. *Forsyth,* 20 Id. 426; *United States* v. *Pacheco et al.,* 22 Id. 226; *Yontz* v. *United States,* 23 Id. 498; *Waterman* v. *Smith,* 13 Cal. 412; *Natoma W. & M. Co.* v. *Clarkin,* 14 Id. 550.)

In the case of *Yontz* v. *United States* (23 How. 498) the Court say, in reference to a grant precisely similar to this, except that it had the approval of the Departmental Assembly: " The claimant comes before us presenting an equity; their title not being completed, because the land has never been surveyed and severed from the public domain. *Hanson's case*, (16 Pet. 200) *Rosa Pacheco's case*, now decided."

II. · The plaintiffs never having presented any claim to the Board of Commissioners, their title is barred, and without standing in any Court of Justice, unless the confirmation to defendant Murphy enures to their benefit; and it cannot have any such effect.

It is true that a confirmation or patent to an assignor enures to the benefit of his assignee by way of estoppel. (2 How. 316; 10 Id. 374; 21 Id. 182; Id. 240, 228; Id. 431.)

To attribute this effect to the doctrine of estoppel, is to admit that the confirmation or patent invests the assignor with the title, but in an action between him and his assignee he is precluded from proving the truth on account of his prior acts. It admits the title to be in him, but forbids in such a controversy any evidence of the fact. ( *Van Rensselaer* v. *Kearney*, 11 How. 326.)

The assignor having previously conveyed the land, is thus forbidden to assert his title by confirmation.

But what act or deed has the assignee committed which precludes him from proving the truth ? He purchased in good faith; he presented his claim in good faith; he litigated it with the Government in good faith; he bore the anxieties and expenses of the most protracted litigation known to history. For ten years in the Courts of the country he has consistently and successfully asserted his title to the land. There is no matter *in pais* or of record upon which an estoppel may work. He acquired a full and perfect title by confirmation, and there is nothing to preclude his assertion of it. But for the doctrine of estoppel, an assignor, being confirmee, might assert his title. The reason of the law does not apply to an assignee—he has committed or suffered no act by which he can be estopped.

But we are not left to reason out this result. The point is *res*

*adjudicata,* and there is no conflict of authority. (*Purvis* v. *Harmanson,* 4 La. Ann. 422 ; *Bradley's heirs* v. *Calvit,* 5 M. 662 ; *Sanchez* v. *Gonzales,* 11 M. 287 ; *Sackett* v. *Hooper,* 3 La. 197 ; *Jewell* v. *Porche,* 2 An. 148 ; *Strothers* v. *Lucas,* 12 Pet. 458 ; *Grignon's Lessee* v. *Astor et al.,* 2 How. 344 ; *Choteau* v. *Eckhart,* Id. 374 ; *Thomas* v. *Phillips,* 7 La. Ann. 546 ; *Guyol* v. *Choteau,* 19 Mo. 547 ; *Pontalba* v. *Copeland,* 3 La. Ann. 86 ; *Pepper* v. *Dunlap,* 9 Id. 137 ; *Farmer's Heirs* v. *Fletcher,* 11 Id. 142 ; *Sandoz* v. *Ozenne et al.,* 13 Id. 616 ; *Hall* v. *Doe ex demise Root,* 19 Ala. 397 ; *De la Croix* v. *Chamberlain,* 15 Wheat. 599 ; *West* v. *Cochran,* 17 How. 410 ; *Landes* v. *Brandt,* 10 Id. 370 ; *Barry* v. *Gamble,* 3 Id. 56 ; *Menard* v. *Massey,* 8 Id. 307 ; *McCabe* v. *Worthington,* 16 Id. 96 ; *Willot* v. *Sanford,* 19 Id. 80 ; *Berthold* v. *McDonald,* 22 Id. 341.)

III.   But suppose we are wrong in these views, the question then arises, can the plaintiffs enforce their asserted rights in this form of action ?   Confirmation and survey, or confirmation by fixed metes and bounds, give a title on which the confirmee may sue in ejectment, and, *a fortiori,* defend. (*Bryan* v. *Forsyth,* 19 How. 336 ; *Bissell* v. *Penrose,* 8 Id. 336–341 ; *Sandford* v. *Taylor,* 18 Id. 412, 413.)

The Supreme Court of California has carried this doctrine perhaps still further, or more properly to speak, extended it to its legitimate conclusion, and holds that such confirmation is tantamount to a patent. (*Waterman* v. *Smith,* 13 Cal. 373 ; *Natoma W. & M. Co.* v. *Clarkin,* 14 Id. 544.)

If then defendant, by confirmation and survey, has derived from the Government a legal title, that title must prevail in an action at law.   If the plaintiffs have any right it is purely equitable, and can only be enforced in a Court of Equity. (*Garland* v. *Winn,* 20 How. 8 ; *Jones* v. *McMaster,* Id. 22 ; *Mezes* v. *Greer,* McAllister, 402 ; affirmed by Supreme Court of U. S., 24 How. 268 ; *Bagnell* v. *Broderick,* 13 Pet. 450 ; *Willot* v. *Sanford,* 19 How. 82 ; *Boggs* v. *Merced Mining Co.,* 14 Cal. 279 ; *Moore* v. *Wilkinson,* 13 Id. 474.)

IV.   If a party stands by and sees his property sold to a *bona fide* purchaser, without caution or word of warning, he is estopped,

upon the highest principle of law and morality, from ever afterwards asserting his title against the purchaser.

The plaintiffs stood by when the defendant presented his claim to the Board of Land Commissioners, witnessed the struggles of a ten years' litigation, and an expense in acquiring a title by confirmation from the Government of the United States equivalent to the full value of the land. They gave no caution, spoke no word of warning, asserted no claim or title, and now, when the litigation is over, and the defendant has doubly paid, before their eyes, the value of the land, they seek to recover, without expense to themselves, what they knowingly and tacitly permitted him to acquire. Whatever right they had was abandoned, and upon the same high principles of justice and morality they should ever be estopped from the assertion of any title to this land—from " reaping where they have not sown, and gathering where they have not strewed."

V. But if we are still mistaken in these views, and the title to the land in controversy is not in defendant, the plaintiffs cannot recover, because they have failed to connect themselves with the original title derived from the Mexican Government. They have made the attempt through the will of José M. Estrada, but the will is silent in regard to this property. If it belonged to Estrada and was not conveyed by him in his lifetime, then as to it he died intestate and the title is in his heirs at law.

But if the residuary clause in the will should be construed to embrace the land in controversy, still the plaintiffs have failed to connect themselves with the will. The devise would then be to the family of Santiago Estrada, and not to Santiago himself, from whom alone the plaintiffs produce a deed.

*Non constat* that Santiago Estrada has now a family, or having one, who they are. Such a devise, instead of investing Santiago with title, would exclude him from all benefit under the will. (*Barnes* v. *Patch*, 8 Vesey, 605.)

FIELD, C. J. delivered the following opinion—BALDWIN, J. concurring.

The Act of Congress of March 3d, 1851, " to ascertain and settle the private land claims in the State of California," in its eighth

section, requires every person " claiming lands in California by virtue of any right or title derived from the Spanish or Mexican Government," to present the same to the Board of Land Commissioners, together with such documentary evidence and testimony of witnesses as the claimant may rely upon in support of his claim ; and makes it the duty of the Commissioners, when the case is ready for hearing, to proceed promptly to examine the same and to decide upon the validity of the claim. And the same act, in its thirteenth section, declares thall " all lands," the claims to which shall not have been presented to the Commissioners within two years after its date, " shall be deemed, held and considered as part of the public domain of the United States."

In the opinion in the *Fremont case,* (17 How. 553) Mr. Chief Justice Taney cites the eighth section, and after observing that it embraces not only inchoate or equitable titles, but legal titles also, and requires them all to undergo examination, says : " The object of the provision appears to be, to place the titles to land in California upon a stable foundation, and to give the parties who possess them an opportunity of placing them on the records of the country in a manner and form that will prevent future controversy." And in the *Fossatt case,* (21 How. 447) Mr. Justice Campbell, in speaking of claims which, under the eighth section, are required to be presented, observes that " it will be at once understood that these comprehend all private claims to land ; " and referring to the Act of March 3d, 1851, and the Act of August 31st, 1852, (relating to appeals from the decisions of the Commissioners) says : " These Acts of Congress do not create a voluntary jurisdiction that the claimant may seek or decline. All claims to land that are withheld from the Board of Commissioners during the legal term for presentation, are treated as nonexistent, and the land as belonging to the public domain."

Whatever doubts may exist as to the validity of the legislation of Congress, so far as it requires the presentation to the Board of claims where the lands are held by perfect titles acquired under the former Government, there can be none as to the validity of the requirement with respect to claims where the lands are held by imperfect or merely equitable titles. ( *Strother* v. *Lucas,* 12 Pet.

448; *Hall* v. *Doe ex dem. Root*, 19 Ala. 392.) Of the latter class is the claim of the plaintiffs under the grant to Francisco Estrada. That grant is one in colonization in the usual form, subject to the approval of the Departmental Assembly, and requiring juridical possession from the magistrate of the vicinage. It is a grant of quantity and not of a specific tract; it is for two square leagues situated within exterior limits admitted to embrace a much greater amount. It passed, therefore, only an interest in the specified quantity, to be afterwards measured and laid off by official authority. Until thus measured and segregated, the interest of the grantee attached to no definite portion of the general tract. The right to make this measurement and segregation remained with the Government and could not be exercised by the grantee, at least so as to bind the Government. Upon the cession of the country, that right passed with all other public rights to the United States. (*Fremont* v. *United States*, 17 How. 545, and *Waterman* v. *Smith*, 13 Cal. 411.) With the possession of the right the duty arose of exercising it for the protection of the interest of the grantee, as Mexico would have exercised it, had her jurisdiction and dominion over the country never been superseded. That interest constituted property, and as such, the Government of the United States upon the acquisition of the country became under obligation to protect it, both by the law of nations, and the stipulations of the treaty of Guadalupe Hidalgo. The obligation was political in its character, and as a consequence, could be discharged at such times and upon such terms as the Government in its judgment might deem expedient. (See *Teschemacher* v. *Thompson*, 18 Cal. 12.)

The exercise of the right of measurement and segregation was not only a duty to the grantee; it was necessary to enable the Government to ascertain the extent of the property it had acquired by the cession of the country; to separate the public lands from those which were private property. And to accomplish both purposes, to enable the Government to execute its treaty obligations; and to enable it to ascertain what were public lands, the Act of March 3d, 1851, was passed. By that act, the Government has announced the conditions upon which it will discharge its political duties to Mexican grantees, and at the same time separate and distinguish

their rights from the public property. It has there required all claims to lands to be presented within two years from the date of the act, and declared in effect, that if, upon such presentation, they are found by the tribunal established for their investigation, and by the Courts, on appeal, to be valid, it will take such action as will result in rendering them perfect titles. But it has also declared in effect, by the same act, that if claims constituting only interests in land requiring measurement and segregation from the public domain be not thus presented, it will take no action for their protection, and the claims will be considered and treated as abandoned. Legislation of this character is not subject to any constitutional objection. The Government must take some steps to determine the extent of its own possessions, and for that purpose may require the presentation of claims which are asserted by individuals, and as a consequence, may prescribe the penalty of nonpresentation. And as to the political obligations assumed by the treaty, it must determine for itself—for no other power can determine for it or control its action in that respect—the mode and manner in which they shall be discharged. The legislation of Congress with reference to these land claims is analogous, to use the language of the Supreme Court of the United States in *Strother* v. *Lucas*, (12 Pet. 448) " to acts of limitations for recording deeds, or giving effect to the awards of Commissioners for settling claims to land under the laws of the States; the time and manner of their operation, and the exceptions to them depend on the sound discretion of the Legislature, the situation of the country, and the emergency which calls for their enactment. Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned."

The claim of the plaintiffs under the grant to Estrada was never presented to the Commissioners under the Act of Congress. It must, therefore, be considered, according to the views we have expressed, as having been abandoned. Like a demand barred by the Statute of Limitations, it has no standing in Court, whatever may have been its original validity. By the Courts it must be treated as nonexistent. The land, therefore, so far as the plaintiffs are concerned, must be deemed to be a part of the public domain of the United States.

But, it is said, that the consequences of nonpresentation prescribed by the Act of Congress cannot follow with reference to the claim of the plaintiffs, inasmuch as the validity of the grant has been confirmed under a claim presented by the defendant, Murphy; and that the United States have thus declared that the land is private property and not a part of the public domain. We do not think the conclusion follows from the confirmation to Murphy. The land may be treated as private, so far as his claim is concerned, and yet be treated as public with respect to the claim of the plaintiffs. We do not understand the language of the act as declaring that, whenever a claim under a grant is not presented, the land shall be deemed absolutely a part of the public domain; but that it shall be thus treated so far as any right of the particular claimant is concerned. Other parties may have asserted successfully claims to the same land, with reference to whom it would, of course, be held as private property. The confirmation under the act operates to the benefit of the confirmee, and parties claiming under him, so far as the legal title to the premises is concerned. It establishes the legal title in the confirmee, and this must control in the action of ejectment. If the confirmee, in presenting his claim, acted as agent, or trustee, or guardian, or in any other fiduciary capacity, a Court of equity, upon a proper proceeding, will compel a transfer of the legal title to the principal, *cestui que trust*, ward, or other party equitably entitled to the same, or subject it to the proper trusts in the confirmee's hands. It matters not whether the presentation were made by the confirmee in his own name in good faith, or with intent to defraud the actual owner of the claim; a Court of equity will control the legal title in his hands so as to protect the just rights of others. But in ejectment, the legal title must control. Nor does this view of the effect of the legal title conflict with the doctrine that an equitable defense may, under our system, be set up as a bar to the ejectment. The answer presenting such a defense is in the nature of a bill in equity, and must contain its essential averments. The defendant then becomes an actor with respect to the matter alleged by him, and his defense must be of such a character as may be ripened by the decree of the Court into a legal right to the premises, or as will estop the prosecution of the

action of the plaintiff.    The equitable defense is, therefore, first to be passed upon by the Court, and until it is disposed of the assertion of the legal remedy is in effect stayed.    Upon the determination of the Court upon the relief prayed by the answer, the necessity of proceeding with the action at law will depend.    When it does proceed, the legal title will control its result.    (*Arguello* v. *Edinger*, 10 Cal. 160 ; *Weber* v. *Marshall*, decided at the present term.)

The views we have thus expressed render it unnecessary to pass upon the effect of the residuary devise in the will of José Mariano Estrada.

Judgment affirmed.

BALDWIN, J. delivered the following opinion—COPE, J. concurring.

Ejectment for certain lands, part of the rancho "Pastoria de las Borregas."    We are indebted to the counsel for a very learned and able discussion of the principles of law governing this case.

The plaintiffs claim through the devisee of one José Mariano Estrada, the father and heir of Francisco Estrada, who was the grantee of a Mexican grant made on the fifteenth of January, 1842.    The grant is in the usual form, but there was no approval by the Departmental Assembly, and no juridical possession.    The clause of the will in question, under which Santiago claimed, is a residuary devise at the conclusion of the will in these words : " The remainder of my property will remain to the family of my son Santiago."    The defendant, Murphy, claims by a confirmation and approved survey of land, under proceedings before the Land Commission taken by him.    No claim was ever presented to the Board by the plaintiffs.    They contend that they have a legal title, founded on the grant, and that the failure to present it did not affect their rights ; but that they can sue the confirmee in possession as they might sue any other trespasser or adverse claimant holding under an inferior title.    We do not think so.    The mere grant by the Governor, unaccompanied by juridical possession, was not a perfect legal title.    The act of the Government in confirming the claim of Murphy, the adverse claimant, followed by the approved survey, invested him with the legal title to the premises, and the plaintiffs

cannot, in an action of law, nullify the confirmation or dispossess him of the land held under it and the approved survey, and to the possession of which he is remitted by the Government. It would lead to infinite confusion if this were not so, and leave titles not only to the public lands, but to private lands, exposed to great uncertainty. The Government had a right to consider this land subject to its dominion for the purposes of the Act of 1851. That Act declares that lands, as to which no claims are presented to the Board, shall be considered public lands of the United States; and the Government might well suppose that, when the present plaintiffs failed to make presentation of their claim, and the adverse claimant presented a claim to the land apparently entitling him to a confirmation, the latter was the party entitled. The Government has proceeded to mark and define the boundaries and segregate the land; and if we were to hold that all this action of the Government is void, the effect would be to open again all the questions as to boundary, etc., and leave the adjacent lands in dispute between the Government or its grantees and the claimants of the equitable title, who, by their own laches, failed to urge their claim and secure their rights in the premises. In *Castro* v. *Hendricks* (23 How. 441) it is said that, to accomplish the purposes of the Act of 1851, " every person claiming lands in California, by virtue of any right or title derived from the Spanish or Mexican Government, was required to present the same to a Board of Commissioners. The mesne conveyances were also required, but not for any aim of submitting their operation and validity to the Board, but simply to enable the Board to determine if there was a *bona fide* claimant before it under a Mexican grant; and so this Court has repeatedly decided that the Government had no interest in the contests between persons claiming *ex post facto* the grant." It would seem to follow, from these and not less decisive intimations in other cases in the Supreme Court of the United States, that the mere fact that a particular person obtained a patent from the Government was not conclusive of his exclusive right; but that it might be shown, *in a proper proceeding,* that others were interested or had the better right. However this may be, and whatever the limitations and qualifications to the principle, if it be correct, we have no hesitation

in holding that the holder or assignee of a grant issued by a California Governor without approval by the Departmental Assembly or juridical possession, cannot recover, in an ordinary action of ejectment, against the confirmee of the Federal Government having an approved survey. We are thus cautious in limiting this decision, because of the great importance of these questions; and we are unwilling, under present circumstances, to decide anything that is not absolutely necessary to the disposition of the case made by the record.

It is unnecessary to pass upon the character or quality of the title of Santiago under the devise recited.

Judgment affirmed.