BOULDIN and others *v.* PHELPS.

*(Circuit Court, N. D. California.* March 28, 1887.)

1. PUBLIC LANDS—MEXICAN TITLES IN CALIFORNIA—POWERS OF GOVERNOR PRIOR TO CESSION.

The governor of California, after the passage of the colonization law of 1824, and the issue of the regulations of 1828, and prior to the acquisition of California, by the United States, had no power to make grants of public lands, except in the manner and upon the terms and conditions expressed in that law and those regulations.

2. SAME—PRESUMPTIONS AS TO POWER.

Power in the governor to make such a grant, after the passage of that law, will not be presumed from the fact that he made the grant.

3. EVIDENCE—JUDICIAL NOTICE—MEXICAN LAWS—CALIFORNIA TITLES.

The courts will take judicial notice of the laws of Mexico, upon which the titles to lands in California depended, prior to the cession of California to the United States.

4. PUBLIC LANDS—CALIFORNIA—MEXICAN LAWS.

The law of 1824 and the regulations of 1828 were, after their adoption, the only laws in force, under which public lands in California could be granted to individuals or families.

5. SAME—GRANT—MARE ISLAND—"DESERT ISLAND"—DISPATCH OF 1838.

If the grant of Mare island, which purports to have been made by Gov. Alvarado to Victor Castro, in 1841, was intended to be made under the authority of the dispatch of 1838, issued by the government of Mexico, to the governor of California, it is void, for the want of power in the governor to make it. The island does not come within the words of the dispatch, as it is not a "desert island, adjacent to the department."

6. SAME—CONCURRENCE OF DEPARTMENTAL ASSEMBLY.

It is also void, because it was not made with the concurrence of the departmental assembly, as required by that dispatch.

7. SAME—FORM OF GRANT—RECORD—COLONIZATION LAW OF 1824—REGULATIONS OF 1828.

The grant cannot be sustained under the colonization law of 1824, and the regulations of 1828, because, there is no sufficient evidence of its genuineness for the following, among other reasons: It is not in the usual form of such grants; it is not attested by the secretary of state; it is not upon habilitated paper; it has none of the usual conditions of such grants; it is not recited therein that it was made in exact conformity with the provisions of the laws; there is no record of the grant, nor any note thereof, in the records of the government; it has not received the approval of the departmental assembly, nor was it referred to the departmental assembly, by the governor; juridical possession of the island was not given.

8. SAME—JURIDICAL POSSESSION.

By the Mexican system, under which public lands were granted, juridical possession constituted the investiture of title.

**9. SAME—APPROVAL OF GRANT BY ASSEMBLY.**

Under that system grants did not become definitively valid, until they had received the approval of the departmental assembly; and if they had not been so approved before the cession of California, they could be made perfect titles only by proceedings under the act of congress of March 3, 1851.

**10. SAME—INCHOATE GRANT—ABANDONMENT—BOARD OF LAND COMMISSIONERS.**

An inchoate grant, was required by the act of congress, to be presented to the board of land commissioners, for confirmation, by parties claiming under it; and if not so presented by them, or parties under whom they claim, the land as to them is deemed public land of the United States.

**11. SAME—DECREE OF CONFIRMATION—EFFECT OF.**

The decree of confirmation rendered by the board, and the order of the district court that a decree of confirmation be entered, will inure to the confirmees and their grantees, and not to parties claiming by derivative title from the original grantee prior to the confirmees.

**12. SAME—SUBSEQUENT PATENT.**

A decree of confirmation, and a patent in pursuance of it, vests the legal title in the confirmees. A confirmation without a patent, does not vest the legal title in any one.

**13. EJECTMENT—NATIONAL COURTS—LEGAL AGAINST EQUITABLE TITLE.**

In ejectment in the courts of the United States, the legal title must prevail, as against a mere equity.

**14. PUBLIC LANDS—MEXICAN GRANTS—INCHOATE GRANT.**

The grant to Castro being inchoate, and not definitively valid, the legal title remained in the United States.

**15. SAME—EJECTMENT—EQUITABLE TITLE.**

A party claiming under a Mexican grant of an imperfect or equitable title, cannot maintain ejectment against another party, claiming under the same grant, by adverse derivative title, who has presented his claim and had it confirmed, whether he acted fraudulently or otherwise.

**16. SAME—RELIEF IN EQUITY.**

Parties having equitable rights as against the patentees, can enforce them only by a bill in equity.

**17. SAME—GRANT OF GOVERNOR ALVARADO TO VICTOR CASTRO—FRAUDULENT AND VOID.**

The grant by Alvarado to Castro is void. Satisfactory evidence is not adduced as to the time when the grant was made. There is no satisfactory evidence that the grant was seen by any one prior to the late spring or early summer of 1850. There is no evidence in the Mexican archives that the grant was issued; nor was it noted in the Toma de Rason, or in the Jimeno or Hartnell index. It was not written upon habilitated paper. It was written upon the back of the half sheet containing the preliminary permission to occupy the island. It is in the handwriting of Alvarado. It was not attested by the secretary of state. The handwriting of the body of the grant and the signature correspond with the handwriting of Alvarado during the period between 1843 and 1850, and not with his handwriting prior to that period. It was written with a steel pen, such pens apparently not being in use in California prior to 1844. It contained the phrase—as translated—"*I do by these presents,*" which is not found in any Mexican document of unquestioned genuineness. *Held:* That the grant was not executed till 1850, after California was transferred to the United States, and it is, therefore, fraudulent and void.

**18. ESTOPPEL—MEXICAN GRANT—MARE ISLAND.**

Where a claim for the confirmation of a Mexican grant, by parties deriving title under the original grantee, has been presented to the board of land commissioners for confirmation, under the act of 1851, and confirmed, the United States, as grantees of the confirmees, are not estopped from showing that the grant so confirmed is fraudulent and void, in a suit brought against their representatives in possession by a *stranger* to the proceedings before the board for confirmation, claiming title under a prior conveyance from the original grantee, who has never presented the grant for confirmation.

**19. SAME—NOT RES ADJUDICATA TILL DECREE ENTERED—CASE IN JUDGMENT.**

Bissell and Aspinwall, claiming title as grantees of Castro, presented to the

board of land commissioners for confirmation, under the act of 1851, what purported to be a grant to Mare island from Gov. Alvarado to Castro. The grant was confirmed, and, on appeal, the district court, the United States not objecting, made an order for a final decree affirming the decree of the board; but no final decree was ever entered pursuant to said order. Pending the proceedings, and before the making of the order for a decree of confirmation, the petitioners and confirmees, Bissell and Aspinwall, conveyed the island to the United States, whereby the latter, at the time the order was made, represented both parties to the proceeding. Afterwards, the plaintiffs brought this action in ejectment against defendant, Phelps, holding possession for the United States, to recover the island, claiming title through an alleged conveyance from Castro, prior in date to that under which Bissell and Aspinwall claimed. Neither plaintiffs nor any of their grantors had ever presented the claim, under the grant to Castro, for confirmation. *Held,* (1) that Phelps, representing the United States, is not estopped, by a final decree of confirmation in the proceedings had by Bissell and Aspinwall, from showing, as against plaintiffs, who are strangers to these proceedings, that the grant is fraudulent and void. (2) If otherwise, a final decree having never been entered in pursuance of the order for a decree, the matter is still in the control of the court, and *sub judice,* and it has not yet become *res adjudicata,* in such sense as to be available as matter of estoppel.

(*Syllabus by the Court.*)

Before SAWYER, Circuit Judge, and HOFFMAN, District Judge.

*Geo. Flournoy, L. B. Mizner, L. D. McKisick,* and *J. B. Mhoon,* for plaintiffs.

*S. G. Hilborn,* U. S. Dist. Atty., for defendants.

*A. L. Rhodes,* for the United States.

SAWYER, J., (HOFFMAN, J., concurring.) This is an action to recover Mare island, embracing between five and six thousand acres of land upon which are situated the United States navy-yard, numerous buildings for quarters of officers and employes of the government, a government hospital, magazines, barracks, and other works erected by the United States at an expense, in the aggregate, of several millions of dollars. A full statement of the facts will be necessary to a proper understanding of the decision.

The defendant, at the time the action was commenced, was commandant of the navy yard, appointed by the secretary of the navy, and, as such, he had possession and control of the island for the United States, under and by virtue of his authority, as commanding officer at that station. He, personally, claimed no possession, right or interest in the island, and no right, or interest, other than for the United States, as an officer of the government. The case has been very deliberately, carefully and ably tried by the numerous counsel engaged, whose efforts have been fully commensurate with the importance of the case, and the vast interests involved. The plaintiffs claim title, under a Mexican grant, alleged to have been made of the island by Gov. Alvarado on May 20, 1841, to Victor Castro, and intermediate conveyances from Castro to themselves. Plaintiffs first introduced in evidence, a petition by Castro to the "senor prefect of the First district," asking a grant of the island, with a marginal reference for information; which petition and reference are dated October 30, 1840; the report to the prefect thereon

by Peralta, justice of the peace, dated November 4, 1840; the further report of the prefecture to the governor by Jose Y. Castro, dated November 14, 1840; and a permission to occupy, signed by Jimeno, governor *ad interim* dated October 31, 1840. A translation of the petition, order of reference, *informe*, and permission to occupy, is in the words and figures following:

[Translation.]

"EXPEDIENTE.

"Stamp 3c.                                                         2 Reales.

"Provisionally authorized by the maritime custom-house of the port of Monterey, in the department of the Californias for the years 1840 and 1841.
"*Alvarado.*                                                    *Atonio Maria Osio.*

[Custom-house Stamp.]    "*Senor Prefect of the First District:*

"Jose Victor Castro, a native of, and resident in, this department, before the known justification of your excellency, as is proper and lawful, presents himself and represents, that it being well known that we generally, every year, receive injuries from the Indians by robberies, etc., and, as I have no secure place to put my little stock, I am under the necessity of coming to the goodness of your excellency; and as there is an adjacent island in the bay of San Francisco, called 'Isla de la Yegua,' which has no owner, of asking that it may be granted to me for depositing my said stock, where it will be safe from the injuries which happen from said Indians. I know, senor, that it will make me some expense to pass over to said island my small property; but I will do it all with pleasure in order to secure what little remains to me.

*Marginal note:* "San Juan de Castro, Oct. 30, 1840. Pass this petition to the justice of the peace of Contra Costa for report, if the said adjacent island, which citizen Victor Costra asks for, is vacant, and if it can be granted; and this being done, return it for decision. "Castro."

"Wherefore, I beg and pray that you will be so good as to decree in favor of the petitioner; swearing," etc.
"*Monterey, October* 30, 1840.                     Jose Victor Castro.

"In virtue of the superior *decreto*, which precedes of Senor Prefect Don Jose Castro, which you have been so good as to send me on the petition for the island called 'De la Yegua,' I ought to say that said island belongs rather to the coast of San Solano, rather than to that of San Pablo, and that to the present time, it is vacant, and this authority, does not know as any citizen has ever pretended to it. This is what I ought to say in compliance with what is asked of me, God and Liberty.
"*Rancho of San Antonio, November* 4, 1840.
"Ygnacio Peralta."

"Most excellent, senor governor, having seen the contents of this petition and the report of the justice of the peace of Contra Costa, and all else presented, the prefecture reports that the petitioner possesses the legal requisites to entitle him to be attended to and that the island asked for, called 'La Yegua' is vacant without any person pretending to it, leaving the matter to your excellency's pleasure.
"*San Juan Batista, November* 14, 1840.                 Jose Y. Castro.

"PROVISIONAL GRANT.

"Manuel Jimeno Casarin, governor *ad interim* of the department of the Californias.
"Civil governor of Upper California.

"Don Victor Castro is provisionally permitted, while the usual steps are being taken, to occupy with horses the island named 'La Yegua,' in the straits of Carquinez.

"In consequence let this commission be delivered to the party interested for his security.

"*Monterey, October 31, 1840.*

[Signed]                       "JIMENO.

[Signed]                       "JOSE L. FERNANDEZ,

                               "Secretary *ad Interim.*"

There is no question, that these documents are genuine, and, that they were executed at the time they purport to bear date. The several documents corresponding to these, constituting an incomplete *expediente*, were found in the Mexican archives, but with these documents the archive evidence ends. There is no final grant, or copy of a grant, and no note or memorandum of a grant, or any further action to be found anywhere in the archives, either in the Jimeno index, Hartnell index, Toma de Razon, or even in loose papers, or elsewhere, and no evidence of any kind relating to the grant in the proceedings of the departmental assembly, or any of the official records of the Mexican government. Plaintiffs, after introducing testimony tending to prove the due execution and genuineness of the document, introduced in evidence, what purports to be a grant by Alvarado, written upon the back of the same half sheet of paper, upon which the provisional permission to occupy, before set out, was written. The said apparent grant, is in the Spanish language, in the handwriting of Alvarado, and dated May 20, 1841, a translation of which is as follows:

"GRANT.

"Juan B. Alvarado, regular constitutional governor of the department of the Californias.

"Whereas, Don Victor Castro, a Mexican by birth, has petitioned to this government for the ownership of the island named 'La Yegua,' situated in the neighborhood of the straits of Carquinez, in consequence of which the foregoing permission was granted him by Senor Don Manuel Jimeno Casarin, for the time being in charge of this government, and in virtue of which the petitioner has repleaded his petition, proving that said island does not belong to the ownership of any individual or corporation. *I have in decree of this day declared, as I do by these presents declare,* Don Victor Castro owner in fee of the said island, in all its extents, conformably with the powers conferred on me by the supreme national government.

"In consequence let this be delivered to the party interested, that it may serve him for a title, and for such other purposes as may be convenient.

"Given in Monterey, capital of the department, on the twentieth day of the month of May, 1841.

[Signed]                        "JUAN B. ALVARADO."

Neither this alleged grant, nor any copy, record, note, or memorandum relating thereto was found in the Mexican archives. It is signed only by Alvarado, without attestation by the secretary, and the body of the grant as well as the signature, were in Alvarado's handwriting. The prior provisional permission to occupy, it will be seen, was attested, as was usual, by the secretary.

After introducing the foregoing incomplete *expediente*, and the said apparent grant, plaintiff introduced testimony tending to show that Victor Castro took possession of the island, and put his stock upon it; that he afterwards, in 1847, sold for $800, and conveyed the island and stock, by a deed in the Spanish language, to one Bryant, who afterward, early in 1848, sold and conveyed his interest to Major Cooper for $441; that the conveyances from Castro to Bryant, and from Bryant to Cooper, were recorded in the alcalde's office at Sonoma, but that the book containing the record had been either lost, destroyed, or mutilated, neither the originals, nor any copies, nor any record of them, so far as known, being now in existence,—the only evidence now offered of their execution and contents being parol; that Bryant, his grantee, Cooper, and Cooper's grantees, being his sons and relatives, holding under him, continued in possession until ousted by the United States in 1852, when possession was taken by the latter, for the purpose, first, of constructing a dry-dock, and afterwards for a navy-yard and naval purposes.

Plaintiffs also introduced conveyances from Cooper, now of record, through which, whatever title Cooper had, passed to plaintiffs, prior to the commencement of this suit. Neither plaintiffs, nor any one through whom they claim, ever presented for confirmation any claim under said grant to Castro, or otherwise, to the board of land commissioners, organized under the act of 1851. Plaintiff, also, read a passage from defendant's petition for a removal from the state court to the United States circuit court,—the passage having been inserted in the petition to show that a question would arise under the laws of the United States, and, that, it is a case within the jurisdiction of the circuit court.

The plaintiffs having rested, the defendant introduced counter-testimony, as to the continued occupation of the island by Cooper and his grantees till the United States took exclusive possession; as to whether there ever was any records of Sonoma other than those now existing, in which the alleged lost deeds could have been recorded; as to whether the records had been destroyed, lost, or mutilated, etc.; also, testimony designed, and tending to show, that the alleged grant by Alvarado to Castro was not executed till some time in the spring of 1850, long after Alvarado had ceased to be governor, and the country had been transferred to the United States, and that it was by Alvarado antedated; and that said pretended grant is, consequently, not genuine, but a fraud. Defendant also introduced an order of President Fillmore, dated November 6, 1850, made upon the assumption that Mare island was public land, reserving it for public use. So far as it relates to Mare island, it is in the.following words: "The president of the United States exempts and reserves from sale for public purposes, the following tracts or parcels of land in the state of California:   *   *   *   (6) Mare island." Also, a letter from the secretary of the navy to the president, dated February 9, 1853, relating to the reservation of Mare island for naval purposes, and an order of the president, made two days later, dated February 11, 1853, directing the reservation; also, a letter of the secretary of the navy, dated February 12, 1853, to the secretary of the interior, stating the fact of these

prior communications, and the reservation of the island for a navy-yard and naval depot.

Testimony was also introduced, showing that the United States, by its agents and employes, took exclusive possession of Mare island as early as September, 1852, for the purpose of constructing a dry-dock, and that they have been in actual, exclusive possession of said island, by their agents, servants and officers from that time to the present. The appointments of successive commandants of the navy-yard commencing with that of Capt. Farragut, August 9, 1854, and continuing down to and including the defendant, Phelps, were shown, and that each, during the period of his command, had been in actual command, control and possession, under and by authority of the United States, in the same manner, and for the same purposes, as the command, control and possession of defendant, Phelps, at the commencement of this suit; and that such command, possession and control were continuous, uninterrupted, exclusive and adverse to the claim of all the world other than the United States, from the time Capt. Farragut assumed command, in 1854, till and including the time of the commencement of this action. The defendants, denying upon the evidence introduced, *pro* and *con*, the genuineness of the alleged grant from Alvarado to Castro, upon which plaintiffs' title wholly depends, or, if genuine, that it is such a title as will sustain ejectment; and, relying upon the legal presumption, that the title to all lands within the state of California is *prima facie* in the United States, which presumption must be overthrown by any party claiming title in himself, by satisfactorily showing that the title passed to private parties by a grant from the Mexican government, before the transfer of California by Mexico, or by a grant from the United States since such transfer, rested.

Whereupon, the plaintiffs, without pretending to claim under the petitioners, or to in any way connect themselves with them, introduced in evidence, under objection and exception by defendants, a petition filed by Bissell and Aspenwall before the board of land commissioners, for the confirmation of their claim to Mare island, based upon the said alleged grant of May 20, 1841, from Alvarado to Castro, and an order for a decree confirming said grant made by the district court, on March 2, 1857, on appeal from the decree of the board of land commissioners, —no decree having been entered in pursuance of said order.

The purpose of introducing this petition and order, as stated by plaintiffs' counsel at the time, was, to show, *first*, that "the grant made by Alvarado to Victor Castro on the twentieth of May, 1841, was at the time the sovereignty of Mexico ceased, and that of the United States succeeded, over the northern part of California, a valid grant; and *second*, for the purpose of precluding or estopping the United States government, and the defendant, from denying that Mare island, the property sued for in this action, was at the date mentioned and ever since has been private property." The defendants objected to the introduction of the petition and order, on the grounds that they were, (1) incompetent, irrelevant, and immaterial; (2) that it was not testimony in rebuttal; (3) that the

plaintiffs were not parties, or in any way whatever, privies to these proceedings; and (4) that the order does not appear to be, and is not, a final decree of confirmation of the grant. The testimony was received, but subject to the objections, and exception of defendant.

The plaintiffs, then, as a branch of evidence, separate and distinct from the petition to the land commissioners, and order of confirmation, last introduced, put in evidence a "certified copy of a deed purporting to have been executed by Victor Castro to John B. Frisbie, and Beezer Simmons, expressing a consideration of seventy-five hundred dollars, which conveys, or purports to convey, Mare island to the grantees, dated May 23, 1850, and purporting to have been witnessed by V. Prudon and O. Livermore and acknowledged May 23, 1850, before EDWARD McGOWAN, justice of the peace, in the county of San Francisco, and to have been recorded December 7, 1851, in Liber H of Deeds, page 220, of Sonoma county records." At the time of offering the deed, plaintiffs denied in connection with the offer, "that Victor Castro ever executed this purported deed, or ever authorized any one to execute it on his behalf," and claimed, that this deed is a forgery; that it never vested any title in Frisbie and Simmons, or conveyed any title whatever out of Victor Castro. This deed is offered in connection with a denial of its genuineness, "for the purpose of showing that the defendant and the United States government in defense of this action claim the title to Mare island under Victor Castro, the common source of title of plaintiff and defendant," the plaintiffs claiming under an alleged elder-lost conveyance from Castro. Plaintiffs, then, introduced sundry mesne conveyances from the grantees in said deed, from Castro to Frisbie and Simmons, including conveyances from the petitioners Bissell and Aspenwall, ending with a deed from Bissell et al. to the United States, dated January 4, 1853, which purports upon a consideration of $83,491, to convey Mare island to the United States. Plaintiffs, also, introduced evidence, a part of which was a bond of indemnity given by the grantors to the United States against failure of title, tending to show that, at the date of this last deed, and prior thereto, the United States were aware of the adverse claim of plaintiffs' grantor, under the alleged conveyances from Castro to Bryant, and Bryant to Cooper, and, therefore, took with notice. Plaintiffs, having rested, defendant put in evidence a deed from Frisbie and Simmons to Victor Castro, dated May 28, 1850, (the same date as that of the deed from Castro to Frisbie and Simmons,) conveying the whole island, acknowledged July 21, 1852, reconveying the undivided one-tenth of Mare island for a consideration expressed, of $10,000,—also, a deed from Victor Castro to Bissell,—one of the said petitioners, and one of the grantors of the United States,—dated July 21, 1852, and acknowledged on the same day, reconveying one-tenth of Mare island, for a consideration of $1,800. The plaintiffs insist that this last deed is, also, a forgery.

Assuming the grant by Alvarado to Castro to be genuine, and to have been, honestly, executed, at the date it bears, the question arises, what are the rights of the parties under it?

The plaintiffs insist, that this grant vests a complete and perfect legal title in their grantor, which it was not necessary to present to the board of land commissioners for confirmation, under the act of 1851; that the legal title, having passed out of the Mexican government, and become fully and completely vested in the grantee, before the transfer of California to the United States, it, is perfect and indefeasible, and cannot be affected by a failure to present it for confirmation; and, that, it having been conveyed by the grantee, Castro, to plaintiff's grantors, before any conveyance to Frisbie and Simmons, grantors of the petitioners before the land commissioners, there was nothing left in the United States, or, which could pass through Bissell and Aspenwall ↖ the United States, and theirs is the better title. The fact, that the subject-matter of the grant is an island, which, as they insist, required no survey to ascertain the precise land granted, is relied on, as an element, which renders the title perfect. On the part of the defendant, it is maintained, that no perfect or complete title ever passed from the Mexican government; that the title at best, is only inchoate; that at most, only an equity passed, leaving the legal title in the government, which passed to the United States; that by the failure of the plaintiffs, or their grantors, to present their claim for confirmation, they lost their right, and as between them, and the United States, the lands under the provisions of the thirteenth section of the act of 1851, must be deemed, and held, to be public lands; but, if otherwise, in view of the presentation of the claim by Bissell and Aspenwall, and the confirmation in that proceeding, the confirmation shown by the plaintiffs, was, to Bissell and Aspenwall, and, upon such confirmation, the right to the legal title was vested in them, and a recovery in ejectment cannot be had against them or their grantees, by parties who, only, have an equity as against them.

It is further insisted, that the only remedy of plaintiffs in that view, is by a bill in equity to charge the confirmees, as trustees, and to control the legal title for their benefit. A question is, also, made, as to the power of the governor of California to grant an island, it being claimed, that under the act of 1824, and regulations of 1828, the governor had no power at all to grant islands. It is insisted by plaintiffs, that the governor having assumed to make an absolute grant. it will be presumed from that fact, alone, till the contrary appears, that he was authorized by the laws of Mexico, to make it. But the governor of California, like any other officer, must show authority for his acts. Says the supreme court in *U. S.* v. *Cambuston,* 20 How. 63

"But no such presumptions are necessary or admissible in respect to Mexican titles granted since the act of eighteenth August, 1824, and the regulations of twenty-first November, 1828. Authority to make grants is there, expressly, conferred on the governors, as well as the terms and conditions prescribed, upon which they shall be made. The court must look to the laws for both the power to make the grant, and for the mode, and the manner of its exercise."

The laws of Mexico in force in California, before and at the time of the transfer of California to the United States, upon which the title to

lands in California depend, must be judicially noticed, and expounded by the courts, in like manner, as other public laws of the state of California. They are laws to be noticed,—not facts to be proved. They are not regarded as foreign laws, but, as laws, that pass with the territory. *U. S.* v. *Turner*, 11 How. 668; *Fremont* v. *U. S.*, 17 How. 557; *U. S.* v. *Perot*, 98 U. S. 430; *Payne* v. *Treadwell*, 16 Cal. 231.

The effect of this grant must be determined, either by the laws of 1824, supplemented by the regulations of 1828, or by the dispatch in relation to the grant of islands, issued by the central government of Mexico, of July 20, 1838. No other law has been called to our attention by which the grant was authorized. And the supreme court has, often, held, that the laws of 1824, and regulations of 1828, were the only laws, thereafter, in force, under which grants of the public lands could be made, to families and individuals in California. *U. S.* v. *Vallejo*, 1 Black, 552; *U. S.* v. *Workman*, 1 Wall. 761.

If the grant in this case was intended to be made under the authority of the dispatch of 1838, as from the wording and form seems probable, it is clearly void. It is not in the form of colonization grants, but in a form similar to those in which Alvarado assumed to make grants of islands under the authority of the central government of 1838. The island, in our opinion, situated as it is, far inland, at the head of San Pablo bay, and the mouth of Napa river, is not within either the purpose, language, or purview of the dispatch. It is not a " desert island, adjacent to the department," but is as far and securely inland within the department as any of the lands on the surrounding and adjacent shores, from which it is only separated by one of those deep channels or sloughs cut by the ebb and flow of the tide through the marsh and overflowed land, like hundreds of others similarly cut through the marshes adjacent to the interior bays and waters and along the shores of the Sacramento and San Joaquin rivers. It might as well be claimed that Sherman's island, and numbers of others in the interior marshes, are within the provisions of the order of 1838. The supreme court was evidently of opinion that Angel island was not within the words of the dispatch, or the declared purpose for which the power was conferred. *U. S.* v. *Osio*, 23 How. 284.

With much greater force may the language of the court in that case be applied to Mare island. But if embraced within the language, the grant was not made in pursuance of the law, as the departmental assembly took no part in the matter. In the *Case of Osio* the supreme court says:

" From the words of the dispatch we think it is clear that the power conferred was to be executed by the governor, in conjunction with the departmental assembly, and, consequently, that a grant made by the governor without such concurrence is *simply void*." 23 How. 285.

And again:

"We are of the opinion that the governor, under the circumstances of this case had no authority, without the concurrence of the departmental assembly, to make this grant." Id. 286.

For the same reasons the grant in this case is simply void for want of power in the governor alone to make it, if its validity depends upon the dispatch of 1838. If it cannot be sustained under the law of 1824, supplemented by the regulations of 1828, it is utterly void for any purpose. This grant in several important particulars is not made in conformity to that law, and those regulations prescribing the requisites for making a complete and perfect title, and the established practice under them. It is not in the usual form. It is not attested by the secretary. It is not on habilitated paper. It has none of the usual conditions. There is no record or note of it in the records, which constitutes the grant, under the Mexican law—no note or *memoranda* of any proceeding subsequent to the petition, reference, *informe* and provisional permission to occupy, given by Jimeno. It was not referred by the governor, to the departmental assembly, for its approval or rejection, and there was no juridical possession, as prescribed by the law. The fifth paragraph of the regulations of 1828 expressly provides that, "the grants made to families, or private persons, *shall not be held to be definitely valid without previous* consent of the territorial deputation, to which end the respective documents [*expedientes*] shall be forwarded to it." See, also, *U. S.* v. *Vallejo,* 1 Black, 552. And the eighth paragraph that "the *definitive* grant asked for, *being made a document signed by the governor shall be given,* to serve as a title to the party interested, wherein it must be stated that said grant is *made in exact conformity with the provisions of the laws, in virtue whereof possession shall be given.*" Thus, it is, expressly, provided, "that the grants shall not be *held definitively* valid without the previous consent of the departmental assembly." And under the eighth clause, the *final* document is *not authorized to be delivered* to the party *until it becomes a "definitive grant,"* that is to say until it has the approval of the departmental assembly and after the delivery of the document issued upon the grant becoming definitive,—possession is to be given in virtue thereof,—that is to say, it is to be followed by the *juridical possession,* which completes and perfects the title. Until these proceedings the title is not definitive, complete, or perfect, but remains inchoate and subject to be defeated. In this case, there was no approval by the departmental assembly. The grant was never referred to it, and it never had any opportunity to express its assent, or dissent; and the paper, such as it is, was issued before the governor was authorized, under the express terms of the law, to issue it. It was not followed by juridical possession, and it is not stated, that it is made in exact conformity to the laws. The juridical possession is not designed, merely, to measure, and definitely, identify the land granted, as it is claimed by plaintiffs, but it was a formal act by which possession was delivered, the title passed, and became finally perfect in the grantee. The judge went upon the land, and after measuring it, when necessary to identify the land granted, directed the grantee to enter into possession, which he did, and "gave evidence of the fact by pulling up grass and making demonstrations as owner of the land." *Malarin* v. *U. S.,* 1 Wall. 290.

So, in *Graham* v. *U. S.*, 4 Wall. 261, the court says:

"The Mexican law, as well as the common law, made formal delivery of possession, or *livery of seizin* of the property, *essential* after the execution of the grant, for the investiture of the title."

This principle is again repeated in the late case of *Van Reynegan* v. *Bolton*, 95 U. S. 35.

There was no action, and no opportunity to act by the departmental assembly, upon this grant. There was no record made of it as required by paragraph 9, and under the Mexican law, the public record thereof, and not the document delivered to the party, was the effective grant. There was no juridical possession. The title, therefore, did not become definitely vested. A grant cannot be perfect or complete where anything remains to be done to perfect it. It is not a complete or perfect title, and it was such a title as it was necessary to present for confirmation under the act of 1851, in default of which the plaintiffs lost their right, and as between them and the United States, nothing else appearing, the land must be deemed to be a part of the public domain. And so as we understand the cases, is the law as settled by the supreme court of the United States.

Says the supreme court in *U. S.* v. *Workman*, 1 Wall. 761

"Grants under those laws were required to be made subject to the approval of the departmental assembly, and consequently, *unless such approval was obtained, the title was not regarded as perfect and complete.*"

So in *Beard* v. *Federy*, 3 Wall. 490:

"The grant of Pio Pico, bearing date on the twentieth of June, 1846, under which the defendants below claimed title to the greater part of the premises in controversy, was rightly excluded. With the offer of the grant, the defendants admitted, that it had never been presented to the board of land commissioners for confirmation, and had never been confirmed. The court treated the grant as one in colonization. All such grants, it is a matter of common knowledge with the profession in California, were made subject to the approval of the departmental assembly. Until such approval they were not definitely valid; and no such approval was obtained of the grant in question, previous to the seventh of July following, when the jurisdiction of the Mexican authorities was displaced, and the country passed under the government of the United States. It remained for the new government succeeding to the obligations of the former government to complete what thus remained imperfect. * * * Such legislation is not subject to any constitutional objection, so far as it applies to grants of an imperfect character, which *require further action of the political department to render them perfect.*"

See, also, *Hornsby* v. *U. S.*, 10 Wall. 238.

It is not denied that an interest may vest by such a grant,—an interest, or incipient title, that would be confirmed upon an application under the act of 1851, under which mere equities are confirmed; or an interest, that would be protected against trespassers upon his possessions by a mere stranger to the title. But such inchoate title, as would be entitled to confirmation is quite different from a complete, perfect title, requiring nothing more to render it definitive and final, and not requir-

ing confirmation at all. The grant relied on, if made under the colonization laws, the most favorable position to plaintiffs, being inchoate and imperfect, and the plaintiffs and their grantors having failed to present their claim under it for confirmation, their right has lapsed, and the lands as to them must "be deemed, held, and considered to be parts of the public domain of the United States." Act 1851, 9 St. 633, § 13; *Estrada* v. *Murphy*, 19 Cal. 271.

In the latter case Mr. Justice FIELD said:

"The claim of the plaintiffs under the grant to Estrada was never presented to the commissioners under the act of congress. It must, therefore, be considered according to the views we have expressed, as having been abandoned. Like a demand barred by the statute of limitations, it has no standing in court, whatever may have been its original validity. By the courts it must be treated as non-existent. The land, therefore, so far as the plaintiffs are concerned, must be deemed to be a part of the public domain of the United States.

"But it is said that the consequences of non-presentation prescribed by the act of congress cannot follow with reference to the claim of the plaintiffs, inasmuch as the validity of the grant has been confirmed under a claim presented by the defendant, Murphy; and that the United States have thus declared that the land is private property and not a part of the public domain. *We do not think the conclusion follows from the confirmation to Murphy. The land may be treated as private so far as his claim is concerned, and yet be treated as public with respect to the claim of the plaintiffs.* We do not understand the language of the act as declaring that, whenever a claim or grant is not presented, the land shall be deemed absolutely a part of the public domain; but that it shall be thus treated *so far as any right of the particular claimant is concerned.* Other parties may have asserted successfully claims to the same land, with reference to whom it would, of course, be held as private property. The confirmation under the act operates to the benefit of the confirmee and parties claiming under him, so far as the legal title to the premises is concerned. It *establishes the legal title in the confirmee, and this must control in the action for ejectment.*"

See, also, *Fossatt's Case*, 21 How. 447, 448; *Rico* v. *Spence*, 21 Cal. 511; *Beard* v. *Federy*, 3 Wall. 489, 490.

The defendants having rested their case, after introducing evidence attacking the validity of the grant from Alvarado to Castro, and relying upon the presumption of title in the United States till shown affirmatively to be elsewhere, the plaintiffs, under objection and exception, as appears in the preliminary statement of the case, introduced the petition of Bissell and Aspenwall, claiming to be grantees under Castro, for a confirmation to them of the grant in question, and an order for a decree confirming the claim made by the district court on appeal. This evidence was, probably, inadmissible in this stage of the case, at least, as not being in rebuttal, and on other grounds stated in the objections. But the court being well aware of the facts, as a part of the public judicial history of land titles, depending on Mexican grants in California, in which one of the judges, at least, performed a conspicuous part, thought it desirable to consider all the known facts affecting the right of plaintiffs to recover. Plaintiffs claiming to be prior grantees under Castro, and not claiming under the petitioners, or to be in privity with them,

insist that the only object of the proceedings for confirmation is to determine what lands are public; that this confirmation settled the question that the grant to Castro is valid; that the lands are not public; that the confirmation inures to the benefit of the party who has the title of Castro; and that they, being the prior grantees of Castro, it inures to their benefit and entitles them to recover.

It has been, undoubtedly, often stated by the courts, that the primary object of the act of 1851, and proceedings under it, was to ascertain what lands were public, and to afford the owners of lands under Mexican grants some ready, convenient and reliable muniment and evidence of title, and that the court, in these proceedings, had nothing to do with settling the conflicting rights of parties arising out of the derivative title from the original grantee; that it was only interested in the derivative title so far as to see, that it had before it parties entitled to be heard. But, as to the other branches of the proposition, the decisions of the courts are all against the plaintiffs. The result of the oft-repeated decision is, that the confirmation and a patent in pursuance of it, vests the legal title in the confirmee; and that, if other parties, who have failed to present their claim for confirmation, have any rights as against the confirmees, they are but equities, and can only be enforced by a bill in equity; that their title, whatever it may be, is not a legal title, upon which a recovery in ejectment can be had. Even a confirmation, without a patent, does not vest the legal title, but only gives the legal right to the title, and to a patent in pursuance thereof. The title derived under a confirmation cannot be, collaterally, attacked in an action of ejectment. Such is the result of the decision in *Beard* v. *Federy*, 3 Wall. 489 *et seq.*

In *Foster* v. *Mora*, 98 U. S. 425, the supreme court holds that, "in actions of ejectment in the United States courts, the strictest legal title prevails. *If there are equities which would show the right to be in another, these can only be considered on the equity side of the federal courts.*" Id. 428.

*Carpentier* v. *Montgomery*, 13 Wall. 480, presents the precise question now involved. A grant had been made to Luis Peralta, who having died, the sons, presented a claim under the grant, and as evidence of their derivative title, what was afterward alleged to be a fraudulent will. The title was confirmed and patented to the confirmees. Grantees of the sisters, also, claiming under the father, the same source of title as the sons, brought suit in ejectment to recover from the grantees of the patentees. The same claim was made, as in this case, that the title to the *rancho* was a perfect title, not needing confirmation. If not, that the confirmation, and patent only segregated the land from the public land, and determined, that the grant was valid, and that the government had no interest; that the title inured to the benefit of whomsoever, had the derivative right from the original grantee,—and that this right could be shown in an action of ejectment against the party claiming under the patent. But these positions were, directly, overruled by the supreme court. After holding that the title was not perfect, and required confirmation, the court said:

"But it is contended, that the confirmation of the title inured to the benefit of the parties really interested, both at law and in equity, and not, merely, to the benefit of the confirmees. This is, undoubtedly, true, so far as the segregation of the lands from the public domain, and the extinguishment of the government title, or claim of title is concerned; but, as it respects the legal estate, the confirmation *inures to the confirmees alone.* The eighth, and ninth sections of the act require the claimant to show, not only, the original title, but his own title by deraignment therefrom. Having established these, the object of the inquest is attained. It, satisfactorily appears, that the land does not belong to the government, and the *claimant appears to be the person prima facie entitled to the legal title.* Hence, the thirteenth section goes on to declare, that for all claims, finally, confirmed, a patent shall issue *to the claimant,* upon his presenting to the general land-office, an authentic certificate of such confirmation, and a plat, or survey of the said land, duly certified and approved by the surveyor general of California, whose duty it shall be, to cause all private claims, which shall be, finally, confirmed, to be, accurately, surveyed, and to furnish plats of the same. This language is utterly, *irreconcilable with the hypothesis, that the legal estate devolves, upon the* confirmation, *to any other parties than the confirmees. The patent is to be given to them, and the legal title cannot be separated from the patent.* It is true, that the fifteenth section of the act declares, that the decree of confirmation shall be conclusive between the United States, and the claimants, only, and shall not affect the interests of third persons. But this was intended to save the rights of third persons, not parties to the proceeding, who might have Spanish or Mexican claims, independent of, or, superior to, that presented by the claimant, or the equitable rights of other parties having rightful claims under the title confirmed. The former class, could still present their claims without prejudice, within the time limited by the statute. The latter class, those equitably entitled to rights in the land, under the title confirmed, were not to be cut off. Their equities were reserved. *But they must seek them by a proceeding appropriate to their nature and condition.* The legal title is *vested in the confirmees,* or will be, when the requisite conditions are performed. *It is not in these equitable claimants. They cannot maintain an action of ejectment against the confirmees, or those claiming under them;* but must go into equity, where their rights can be properly investigated with a due regard to the rights of others." Id. 494, 495.

The court cites, as establishing this doctrine, *Wilson* v. *Castro,* 31 Cal. 420; *Estrada* v. *Murphy,* 19 Cal. 272; *Banks* v. *Moreno,* 39 Cal. 233; *Beard* v. *Federy,* 3 Wall. 478; and *Townsend* v. *Greeley,* 5 Wall. 326,—in which last case it is said: "The confirmation only inures to the benefit of the confirmee, *so far as the legal title is concerned.* It establishes the legal title in him, but it does not determine the equitable relation between him and third parties." Id. 335.

So, after using language similar to the preceding; the court in *Estrada* v. *Murphy,* 19 Cal. 272, adds:

"It matters not whether the presentation was made by the confirmee, in his own name, in good faith, or *with intent to defraud the actual owner of the claim,* [as alleged in this case;] a court of equity will control the legal title in his hands so as to protect the just rights of others. *But in ejectment, the legal title must control.*"

See, also, *Singleton* v. *Touchard,* 1 Black, 342.

So in *Brown* v. *Brackett*, 21 Wall. 388, it was claimed on the principles asserted by plaintiffs, that because, a claim to part of a grant had been confirmed to one petitioner, this was a recognition by the government of the validity of the whole grant, and, that one who had not presented his claim for confirmation, holding under the original grantee of *another part of the ranch*, embraced in the confirmation, might invoke the decree of confirmation, to establish his title.    Upon this proposition the court says:

"It is, undoubtedly, true, as contended by counsel, that the tribunals of the United States in acting upon grants of land in California of the former Mexican government, under the act of 1851, were concerned, only, with the validity of the grants; as they came from that government, and were not interested in any derivative titles from the grantees, further than to see, that the parties before them, were *bona fide* claimants under the grants.    And it is, also true, that the decrees of confirmation,—and the patents which followed, inured to the benefit of all persons deriving their interests from the confirmees. But in these positions, there is nothing which gives countenance to the pretensions of the plaintiff in this case.    *Every confirmation is limited by the extent of the claim made.*"

And the court closes its opinion as to the effect of confirmation, thus:

"After the full and elaborate consideration which has been heretofore given in this court, in the numerous cases before it, to Mexican grants in California, we do not feel called upon to say more as to the effect of a confirmation of claims under them.    Every conceivable point respecting these grants, their validity, their extent, and the operation of decrees confirming claims to land under them, has been frequently examined; and the law upon these subjects *has been repeated even to wearisomeness.*"

See, also, *Emeric* v. *Penniman*, 26 Cal. 122; *Hartley* v. *Brown*, 46 Cal. 203; *Hartley* v. *Brown*, 51 Cal. 467; *O'Connell* v. *Dougherty*, 32 Cal. 458.

Other cases might be cited to the same effect, but surely these are enough to establish the rule, that a party claiming by derivative title from a Mexican grantee, of an imperfect equity, who has not presented his claim for confirmation, cannot maintain ejectment against another party claiming under the same grant by adverse derivative title, who has presented his claim, and had it confirmed, whether he has acted, fraudulently, or otherwise.

Counsel for plaintiff have earnestly pressed upon the attention of the court the case of *Steinbach* v. *Stewart*, 11 Wall. 569, in connection with that of *Houghton* v. *Jones*, 1 Wall. 705, as sustaining their views upon the points made by them, and, especially, that the confirmation to Bissell and Aspenwall inures to their benefit; but, in our judgment, they afford no support to any of their positions.

In *Steinbach* v. *Stewart*, Pena obtained a grant in 1840, which was approved by the departmental assembly in 1845.    He conveyed his interest to Vallejo, who, on August 12, 1846, conveyed a portion to Hoeppener.    On March 2, 1853, after his conveyance to Hoeppener, Vallejo presented his claim under the grant, under the act of 1851, and it was confirmed on July 13, 1859.    The decree expressly provided as follows:

" Provided, that this confirmation of the above land to the said M. G. Vallejo shall be without prejudice to the rights of the legal representatives of Lazaro Pena, the original grantee, or whoever may be entitled to said lands under him; and said confirmation to said Vallejo *shall inure to the benefit of any person or persons who may own or be entitled to said* land by any title, either at law or in equity, derived from the original grantee by deed, devise, descent, or otherwise."

The conveyance to Hoeppener was indorsed on the *expediente*, and thus constituted a part of the record in the case for confirmation. The contest was between the grantees of Hoeppener and subsequent grantees of Vallejo, under deeds covering the whole premises. The court simply held that, under the express terms of this provision of the decree, the confirmation inures to the benefit of Hoeppener, who was a prior grantee of the petitioner and nominal confirmee, Vallejo, of the lands which he, (Vallejo) conveyed, (to Hoeppener;) and that the grant was also imperfect. " But when afterwards the district court confirmed the land to him [Vallejo,] the confirmation *inured to the benefit of his prior grantee.* It was not the acquisition of a new title, but the establishment of his original right, *and this was expressly decreed by the proviso already quoted.* By that it was adjudged that the confirmation should inure to the benefit of any person or persons who owned or were entitled to the lands by any title in law or in equity, derived from the original grantee by deed, devise, descent, or otherwise. If, therefore, Hoeppener, or his grantees, held any such title, it was *confirmed to them as truly as if he, or they, had been petitioners for such confirmation.* Now, it is in virtue of this decree of the district court that the plaintiff claims. He has no standing without it. Asserting his rights through it, the law will not permit him to repudiate any part of its provisions." The court further adds: "The proviso was, therefore, nothing more than the declaration of what would have been the legal effect of the decree without it."

Undoubtedly, this is so. Had the grant, now in question, been presented by Castro and confirmed to him, undoubtedly, it would have inured to the benefit of whoever had the derivative legal title from him, as the decree in favor of Vallejo inured to the benefit of his grantees, the one having the first valid conveyance from Vallejo taking the title. But that is not this case. The petition was not by Castro, nor for any confirmation to him. It was to one set of his alleged grantees that the claim was confirmed, and the confirmation inured to them and their own grantees only; not to other parties not claiming under or in privity with them. Their claim, which was confirmed, was not in subordination, but adverse to that of plaintiffs. The plaintiffs' failure to present their adverse claim worked an abandonment, and their right wholly lapsed, unless they can establish equities against the confirmees and those claiming under them.

The case of *Houghton* v. *Jones, supra,* only decides that the supreme court will not consider a question as to the character of the title which was not presented in the court below, and does not arise on the record. It decides nothing pertinent to this case. The grant to Castro being

inchoate and not definitely valid, the legal title still remains in the United States. No patent has as yet been issued to the confirmees, Bissell and Aspenwall; but, had it issued to them, it still would have inured to the benefit of the United States, their grantees, under the conveyance from Bissell and Aspenwall, introduced by plaintiffs, to whom it would have immediately returned through them. Had the patent issued to the confirmees, Bissell and Aspenwall, and no conveyance been made to the United States, the legal title would have been in them, under the authorities cited. Plaintiffs could not have maintained ejectment against them. A conveyance to the United States from the patentees would put the United States in no worse position, in respect to maintaining an action at law, than that occupied by their grantors.

But there has, as yet, been not only no patent issued, but no final decree of confirmation has been entered. True, there was an order for a decree made as long ago as March 2, 1857, but no decree in pursuance of the order has yet been entered. There is no final decree, and there never has been one, from which an appeal could be taken to the supreme court. The matter is still *sub judice*. There being no dispute as to the conveyances of whatever interest Bissell and Aspenwall had, the United States, as the case now stands, as they were when the order for a decree was made, are, substantially, both petitioners and defendants, and the management of both sides of the case is under their control. There is nothing to hinder them to-day from going into court, and upon consent of parties, have the order for a decree of confirmation set aside, and the whole proceeding dismissed, whereby the title under the grant would wholly fail; or from having the decree entered in pursuance of the order.

While the case so remains *sub judice*, the legal title cannot pass out of the United States to the rightful holders of the inchoate grant other than the United States, whoever they may be; and the United States stand in an impregnable position on that legal title, whether as original holders, or as grantees of the confirmees against any assaults in an action of ejectment by those holding only equities, even though the legal title be held by the United States in trust for those having the equitable right to the land. The *cestui que trust*, cannot sue his trustee, in possession, holding the legal title, and recover the land in ejectment. Under the views expressed, it appears plain to us, that this action cannot be maintained, even assuming that the grant to Castro is regular, genuine and valid to pass an inchoate title.

We might well stop here, and rest our decision in favor of the defendant upon the law applicable to the undisputed and assumed facts. But the genuineness of that grant is assailed, and as we think, successfully, by the defendant. That the alleged grant is in the handwriting of Alvarado, and that the signature of Alvarado is genuine, there is no doubt. This fact is not disputed by the defendant. But it is claimed, that the document was not executed at the time it bears date, or prior to 1850, long after Alvarado ceased to be governor, and after the transfer of California to the United States. There was no direct testimony introduced, except that of Alvarado, himself, tending to show that this grant, was

in existence, or was seen by any body prior to some time in the spring of 1850, and much tending to show that it was not. The affirmative of the proposition, that it was executed at the time it bears date, rests solely upon the presumption, that an instrument was executed at the time it bears date and the testimony of Alvarado. The presumption, alone, is of little force, when the fact is contested upon any plausible ground, and there is testimony to the contrary.

We will first consider the testimony tending to establish the affirmative of the proposition. Alvarado is dead, and his testimony taken before the board of land commissioners, is introduced, to establish the date of the execution of the document; and this is the only direct testimony upon the point. Alvarado was shown the paper containing the preliminary permission to occupy by Jimeno on one side of the half sheet of paper, and the alleged grant in question on the other, and then asked the question: "State if you know the *handwriting and signatures* to said document. If yea, state *your means of knowledge* and *also whether they are genuine;*" to which he replied: "I know the handwriting of Manuel Jimeno, and Jose Y. Fernandez. I have seen them both write, and their signatures, as they here appear are genuine. And *this is* also *my own proper signature*, which I signed here *at the time the paper was dated.*"

This is the only statement made by him, as to when the paper was signed. It was a voluntary statement as to this particular fact, of an, apparently, swift witness; for he was not asked *when* it was signed. Taken, literally, he does not say, it was signed at the time "*it bears date,*" but at "the time the paper *was dated,*" that is to say, at the time he dated the paper, or wrote the date, which might have been in 1850, or any other time, as well as in 1841. Whether this was deliberately designed to be equivocal, we do not know, but for the purpose in hand, take it as a statement, that it was signed at the date it bears.

Further on he was asked: "Have you a distinct recollection of *having signed the document* which has been exhibited to you in this case?" To which he replied: "*I do not remember the act of signing it,* though I *know it is my signature, and that I did sign it, I have no doubt.*" This answer wholly neutralized his previous answer, as to when it was signed. He is satisfied he signed it, because it was his signature. But he did *not remember the act of signing.* If he did not remember the act, itself, he certainly could not tell the particular time, when the act was performed; and his loose, equivocal, voluntary answer, as to time goes for nothing. And the next question and answer strengthen this view: "Where were you when you did sign it? *Answer.* I *ought* to have been at the place where the paper is dated. I *ought* to be in Monterey;" not that he was there. "Do you recollect, positively, where you were when you signed said document? *Answer.* I recollect what I have already answered. Do you decline to give a direct answer about your recollections? I do not. Then answer the question, whether you remember where you were when you signed it? I *would say* independent of the document as a means of refreshing my memory that I was at Monterey. In what house at Monterey? I do not remember. Do you know, independent of the

wording of the instrument that you signed it at Monterey? I do know that I did sign it in Monterey, *independent of the wording of the document.* By what circumstances do you recollect it? Because I was governor, and I was at the head of the department, at the seat of government at the time. Who was secretary at the time? I think Jimeno was." After sheltering himself from answering sundry other question under the usual phrase of a prevaricating witness, "I do not remember," he was asked: "Why did you *write* this grant? I did it because I chose to, and had the authority to do it. In whose presence did you write? I do not remember. Do you *recollect having written it? Answer. I do not remember the act of writing it.*"

This, with many other evasive answers, and "I do not remember," constitute his entire testimony as to the time when this grant was executed. Although Alvarado was at the time in question somewhat lavish in making grants of islands to his near relatives and subordinates, it requires no small tax upon one's credulity to believe that he did not, in fact, perfectly remember every circumstance connected with this grant. Up to his time grants of islands were, rarely, if ever made. It is not likely, that at this time, he was so overwhelmed with public cares, that he could not remember the circumstances of granting to his brother-in-law an island containing nine square miles, lying almost within sight of his own residence when at home. It is inconvenient to bring too many particulars into view, if one is testifying falsely.

Manifestly, Alvarado's testimony is little short of worthless, to establish the affirmative of the contested issue between the contending parties. He confessedly, did not remember the *act of writing his signature*, or of making the grant. He so directly says, and when pressed repeated the statement. Consequently, it is impossible, that he should know the time, when, or the place where, the act was performed. He, evidently, concludes, or pretends to conclude, that he wrote it, from the fact that he found his handwriting there, and, he infers that, it was done at Monterey, which was his official residence, and he should, ordinarily, have been there. But, had he been there, the grant, as was the universal custom would have been written by the chief clerk, Francisco Arce, and as was, also, the universal custom, the grant would have been attested by the secretary, Jimeno.

Hopkins, the best informed man now, or ever, in California, on this subject, who has made it almost a life-long study, testified that he did not remember an instance of an unquestionably genuine grant, where the grant was written on the back of the provisional concession, or not attested by the signature of the secretary. But, as has been shown in other cases, wherein the grants were charged to have been fabricated by Alvarado after the acquisition of California, Alvarado's testimony is unreliable. It has been so adjudged by the supreme court. Thus, in the case of the grant to Angel island, dated about the time the grant of this island purports to have been made, the supreme court wholly discredited Alvarado's testimony. And in the case of the grant of Yerba Buena island, made by Alvarado, to Jose Castro, another brother-in-law and a

brother of Victor Castro, the alleged grantee of Mare island, Alvarado testified in positive terms, that he made the grant in 1838, in which he was supported by the testimony of several of the Castros. The grant was nevertheless, rejected. *U. S.* v. *Polack*, Hoff. 286. With reference to the character and credibility of Alvarado's testimony, in the *Case of Angel Island*, long after the present case was disposed of by the board of land commissioners, and by the district court on appeal, the supreme court of the United States said:

"Governor Alvarado testified, that his signature to the grant was genuine, and that he gave *it at the time of its date.* In effect the other witness testified, that he was acquainted with the handwriting of the governor, and, also, with that of the secretary, and that they were genuine. Where no record evidence is exhibited, the mere proof of handwriting by third persons, who did not subscribe the instrument as witnesses, or see it executed is not sufficient in this class of cases to establish the validity of the claim, without some other confirmatory evidence. But the testimony of Governor Alvarado stands upon a somewhat different footing. His statements purport to be founded upon knowledge of what he affirms, and if not true, *they must be willfully false,* or the result of an imperfect or greatly impaired and deceived recollection. Resting, as the claim does, in a great measure, so far as the genuineness of the grant is concerned, upon the testimony of this witness, we have examined his deposition with care, and think proper to remark, that it discloses facts and circumstances which to some extent affect the credit of the witness. By his manner of testifying, as there disclosed, he evinces a strong bias in favor of the party calling him, as is manifested throughout the deposition. Some of his answers are evasise; others when compared with preceding statements in the same deposition, are contradictory; and in several instances he refused altogether to answer the questions propounded on cross-examination. Suffice it to say, without entering more into detail, that we would not think his testimony sufficient without some corroboration to entitle the petitioner to a confirmation of his claim." *U. S.* v. *Osio*, 23 How. 280.

These observations of the supreme court, are as pertinent to Alvarado's testimony in this case, as to that, then, before the court. Only, in this case, he is much less positive, and does not remember the act of making the grant at all.

The only other supporting testimony introduced in this case, that even remotely, bears upon the date of the execution of this instrument, is, a loose reply of Castro to a question introductory to matters relating to his possession of the island, apparently not designed, and, certainly, not calculated to elicit an answer to prove the date of this particular grant. After having stated in answer to a question, that he knew Mare island, its situation, etc., he was asked: "When did you *first* know the island, called 'Mare Island?' *Answer.* At the time I received the grant from the Mexican government. When was that? *A.* In 1841. What did you do about the island in 1841? I took fifty mares, ten horses and two burros to the island." And to the first cross-interrogatory by defendants: "You occupied that place, Mare island, from the time you got it from the government up to the time that you sold it? *A.* I occupied that island the *same year* the government conveyed it to me. I kept all my mares, horses and jackasses there."

Now this has little, or no tendency to prove the date of the execution,

or the fact of execution itself, of the grant in question. No direct attempt was made to prove by this witness, either the execution of the grant by Alvarado, or the date of its execution. No question was asked him upon either of these points. The testimony was directed to proving occupation. These answers, except the words "in 1841," are as applicable to the preliminary permission to occupy given by Jimeno, governor *ad interim*, in the fall of 1840, as to the alleged grant of Alvarado bearing date May 20, 1841. And it must, necessarily, have related to the provisional permission to occupy, and not the final grant, otherwise it is manifestly untrue, for he did know Mare island in 1840, when he petitioned for it, and obtained provisional permission to occupy. Alvarado says in his testimony, read in evidence: "I was well satisfied said Castro occupied said island *before he obtained said grant*,"—meaning the grant in question signed by Alvarado.

If we are permitted to notice *this part* of the record of the *Mare Island Case* in the district court on appeal from the land commissioners, with which we are all familiar, but which part was not formerly introduced in evidence, we find, that, Castro's brother Jose, testified, that "Victor Castro occupied it in the year 1840 by putting mares and horses on it;" that he himself helped put them on the island; that he thought it was in October or November, 1840, (which is about the date of the permission,) as the rainy season had commenced, and being asked, what grant he meant when he said the horses were put there after the grant, he said, "I mean the first provisional concession by Jimeno." But whether we can notice this testimony or not, can make no difference, for the same conclusion is inevitable without it. Doubtless, that is the grant to which Victor Castro referred, as he would, naturally, occupy the premises he petitioned for, as soon as permission was given. He seems to have been in a hurry, for the provisional concession was made even before the *informe*. This loose answer, to a loose question, apparently, intended only to bear upon the question of occupation, 46 years after the happening of the event, is of no value as evidence, to prove the execution of the grant by Alvarado, and, still less, to prove the time of its execution.

The testimony of Alvarado, and Victor Castro, quoted, is all the evidence introduced in the case, tending to prove the date of the execution of the grant in question. There is no evidence whatever, in the Mexican archives, that this grant was ever issued by Alvarado to Castro. There is no copy of the grant, and no note or memorandum of it in the Jimeno or Hartnell index, nor does it appear to have been noted in the Toma de Razon, or any of the records, or papers, found in the archives, and no note, or reference to it in any of the records of proceedings of the departmental assembly. There is no affirmative evidence at all, tending, in any degree, to show that this alleged grant was noted in the Toma de Razon, which was destroyed by fire in 1851, but much inferential testimony to the contrary. The other archives are still in existence and they contain no allusion to the grant.

Upon the evidence stated, alone, if there were no other grounds of sus-

picion as to the genuineness of the alleged grant, it is settled by numerous later decisions of the supreme court, that this grant should not be confirmed; and as strong a case, at least, should be made to sustain a recovery in ejectment, as is required to justify a confirmation. Says the court in *Peralta* v. *U. S.*, 3 Wall. 440:

"The Mexican nation attached a great deal of form to the disposition of its lands, and required many things to be done before the proceedings could ripen into a grant. But the important fact to be noticed is, that a *record* was required to be kept of whatever was done. This record was a guard against fraud and imposition, and enabled the government to ascertain with accuracy what portions of the public lands had been alienated. *The record was the grant, and without it the title was not divested.* The governor was required to give a document to the party interested, which was evidence of title, and enabled him to get possession; but this '*titulo*' *did not divest the title, unless a record was made in conformity with law. Written documentary evidence, no matter how formal and complete, or how well supported by the testimony of witnesses, will not suffice, if it is obtained from private hands, and there is nothing in the public records of the country to show, that such evidence ever existed.*"

So, also, in *Romero* v. *U. S.*, 1 Wall. 744, 745, the rule is stated thus, and authorities cited:

"Suppose it be conceded, however, that the probative force of the parol testimony is not overcome by the contrary tendency of the written evidence, the concession could not benefit the claimants, because the case is one, where *there is no record evidence of any kind to prove either the existence, or the authenticity of the grant.* Assuming that state of the case, then, it falls, directly, within the class of cases, where confirmation has been refused, because there was no record of evidence to support the claim."

To the same effect are *U. S.* v. *Cambuston*, 20 How. 64, and 7 Sawy. 593; *U. S.* v. *Teschmaker*, 22 How. 405; *U. S.* v. *Pico*, Id. 406; *U. S.* v. *Vallejo*, Id. 416; *U. S.* v. *Osio*, 23 How. 273; *U. S.* v *Bolton* Id. 350; *Luco* v. *U. S.*, Id. 543; *U. S.* v. *Castro*, 24 How. 350; *U. S.* v. *Vallejo*, 1 Black, 555; *Pico* v. *U. S.*, 2 Wall. 282; *Palmer* v. *U. S.*, 24 How. 126; *U. S.* v. *Knight*, 1 Black, 251.

Thus the affirmative proof, considered of itself, fails to establish the genuineness of this grant under these rules laid down by the supreme court which are binding on this court.

But there are other opposing facts which greatly strengthen the case against the genuineness of this grant, to which we will now call attention. In *Cambuston's Case*, the supreme court twice refer to the fact, as one of great significance, that, in the language of the court, "although purporting to be made on the twenty-third of May, 1846, it [the grant] was unknown to any person besides the grantor himself, and another interested party, till filed among the public archives, tenth July, 1850, after the cession of California by Mexico to this government." *U. S.* v. *Cambuston*, 20 How. 61, 64.

This was a period of but four years. In the present case, although there was an anxious inquiry for a final grant, as early at least, as in 1847 to 1848, there is no evidence, that anybody ever saw the grant in

question, or knew of its execution or purport, until, to the surprise of the parties, who claimed whatever interest Castro ever had in the island, it unexpectedly, turned up in the hands of Frisbie in the late spring or early summer of 1850,—nine years after it had been made, and three years after it had been so diligently sought.   There was no positive, unequivocal evidence introduced that even Alvarado, or Castro, ever saw it before 1850.   True, Alvarado voluntarily said he signed it "when it it was dated,"—that is, literally, he signed it when he dated it; yet he afterward, said twice, that he had no recollection of the act of signing, and the result of the evidence is, that he only inferred that he signed it at the time, and at the place where it purported to have been executed from the fact, that the grant was in his handwriting, and the signature was his, and Monterey was his official residence at that time, and he ought to have been there.

What little was loosely said by Castro in proving his possession and occupation, which was, undoubtedly, taken under the permission granted by Jimeno, is still less significant.   It does not even appear, that Castro ever saw this grant till the trial of this case, or even, then, for it was not shown to him, and he was not examined upon it.   If it were necessary for the court, on the evidence in this case, to decide whether Alvarado ever in fact saw this grant before 1850, and whether Castro ever saw it before the trial of this case, or at any time, it would ·be difficult to find, satisfactorily, in the affirmative on either proposition. There is no evidence that Bryant ever saw or heard of this grant.   There is evidence tending to show that Bryant settled upon the island, claiming a possessory right; that he found it occupied by Castro's stock; and that he finally purchased Castro's interest, whatever it was, in this island, containing between 5,000 and 6,000 acres of land, and all the stock,— the 60 or more head of horses and mules, 50 being mares, and the seven years' increase from 1840 to 1847,—for $800.   And that is all there is relating to his knowledge of this grant.   Castro's actual possession under the permission to occupy, and his stock, furnished a sufficient basis for this conveyance.

So there is evidence tending to show that Major Cooper—under whom plaintiffs claim, and by far their most reliable and important witness— also, settled upon the island, setting up an independent possessory claim against Bryant; that disputes arose about their rights between him and Bryant; and that, finally early in 1848, he purchased Bryant's interest for $441, evidently supposing, at the time, that he was only getting a possessory title.   There is not a *scintilla* of evidence that Major Cooper ever saw or knew of this particular grant till exhibited to him by Frisbie in 1850, who complained of the occupancy of the island by "Cooper's boys;" when the major indignantly denounced it as a forgery.   But this testimony of Cooper is direct and positive to the contrary.   Before he bought out Bryant, Major Cooper had sought for Castro's title at Castro's, in San Pablo, and, failing there, had sent his son-in-law, Dr. Semple, to Monterey in quest of it, but all he could find was the preliminary permission of Jimeno to occupy; and Cooper then declined to purchase,

on the ground that there was no title. Afterward, however, he concluded to purchase, he says he don't know why; but, doubtless, he thought the possessory right, and what he got, worth the small sum paid. He had vainly sought the title papers, where they ought to have been, at Castro's in San Pablo. Had he found the grant, there would have been no occasion for that extraordinary, and fruitless journey to Monterey, of Dr. Semple in search of it, so graphically described by one of plaintiffs' counsel.

The opinion of the board of land commissioners was read by plaintiffs counsel, to show, that the title was affirmed by the board, and the grounds of affirmance. In this opinion the board calls attention to the evidence of Major Cooper given in that case, when these matters were recent, and fresh in his recollection, to the effect, that he first saw the grant in question, in Frisbie's hands in 1850, written upon the back of the preliminary concession by Jimeno, and, that, he told Frisbie, that it was not there before, and charged it as being a forgery. It, also, states the testimony of one of plaintiffs' present counsel, that he was called upon by Major Cooper to translate the permission to occupy for him, which he did, and did not see the important document upon the other side of the same half sheet of paper, and the testimony of Mc-Donald, that he, too, was shown the document for the purpose of enabling him to advise Cooper as to his rights. He saw no grant upon the other side. The commissioners observe, in substance, that it would seem impossible, that all these men could examine, critically, and transcribe this document, without seeing the writing on the other side, which was so heavily written, as to be plainly visible through the paper. Yet, they assumed, that Alvarado's testimony was direct and positive, as to date, and place of execution, and could not think, that a high official could commit flat perjury, and on this consideration, they confirmed the grant. At that date, the character of the testimony of Mexican officials of the last few years before the acquisition of California, had not been so fully ventilated, as has, subsequently, been done. But upon carefully reading Alvarado's testimony, it will be found to be so cunningly, framed, as to render it very difficult to convict him of perjury upon it, whatever the facts may be. Thus, it appears, that the most important witness for the plaintiffs now, he being one of their grantors, and one of their leading counsel in this case, were, before the land commissioners, the principal witnesses, to overthrow the grant.

On the trial of this case a new witness was examined on this very important point,—Dr. Frisbie, of Vallejo, a brother of Captain Frisbie, who first brought this grant to light. He testifies, positively, that, in the spring of 1850, he was in his brother's office and on some occasion examined papers in his safe, among which was one purporting to be a permission by Jimeno to Castro to occupy Mare island, of the purport and appearance of that now in evidence, on the back of which the alleged grant is written. He believed it to be the same. At that time it had no grant written upon the other side. He is a credible witness, whose testimony has not been assailed, now produced for the first time,

and his testimony is positive, clear, and certainly significant. It is in exact accordance with the testimony of Cooper, Mizner, and McDonald, given before the board of land commissioners. He examined the paper carefully, and the grant could not have been on it without his seeing it. Mr. Hopkins testifies, it is true, that the grant seems to have been written after the paper had been folded; but it is now in so badly torn and mutilated a condition at the folds that it cannot, as it appears to us, be told with any degree of certainty whether it was written before or after folding. But if it be so, this would not be decisive, as there may be other explanations.

The plaintiffs' counsel referred to his own testimony before the commissioners, and said that, of course, if he were to testify now, his evidence would not be different from what it was before, and he says that the grant could not have been on the copy he saw at that time. He suggests, however, that there might well have been two copies of Jimeno's concession, one with and the other without the grant upon it, and the one seen by these witnesses, might have been the one without it. But there is no testimony, nothing but mere hypothesis, to support this theory. Besides it is a very improbable one. There is no testimony to show, where this grant was during the nine intervening years between 1841 and 1850, while it was so earnestly sought for, far and near, by parties interested in it. And this fact, as we have seen, is regarded by the supreme court as very significant. If Castro once had it and disposed of it, he could have told to whom. He had been applied to for the document by the parties who were entitled to it as a muniment of title, if, as alleged, they had acquired his interest. There is something surprising in his long and continued silence on this subject,—continued even to this moment. Frisbie must have known where he got this alleged grant. Castro, at the trial in this case, was on the stand for two days, yet not a question was put to him touching the execution, or time of execution, of the grant, or its whereabouts during its long unaccountable seclusion from 1841 to 1850. Neither Frisbie, nor Castro, was examined in the case before the land commissioners, where the vital question was as to the genuineness of this grant,—that being the principal issue in the case. The fact that no one appears to have ever seen this document, when it was so, diligently, sought for, and under all the circumstances disclosed by the evidence, until it suddenly came to light, so mysteriously, in the hands of Frisbie in 1850, raises a strong presumption that it was non-existent.

The grantors of the plaintiffs never presented their claim for confirmation, which is a strong indication, that, at the time, when the matters were all fresh, and the facts whatever they are, were better susceptible of proof than now, they did not have any confidence in the title. We know that Major Cooper did not consider it genuine, and it is not probable that his grantees, who were sons and relatives thought differently of it. There is no evidence that they did. It seems scarcely probable that a claim would not have been presented, which had become so valuable before the time for presentation had expired, had the parties in-

terested believed, that they had a genuine valid grant. "Cooper's boys" held the Cooper title till 1877, without any active efforts to maintain their rights, under it. After about 27 years' waiting, in 1877 the present plaintiffs appear, through conveyances, to have commenced gathering in the numerous undivided interests, for the purposes of this suit. In the mean time the United States had been in uninterrupted possession, spending millions of dollars on it. The fact that Bissell and Aspenwall presented an adverse claim upon the same grant, was no obstacle to the presentation of a claim on the part of the plaintiffs' grantors, on their alleged prior derivative title.

There are certain other intrinsic probabilities arising out of the known facts, that should have considerable weight in determining the time when, and place where, the alleged grant was executed. The law expressly requires that a record of the grant should be made in the archives. There is no note or record of any kind, of this grant, as has been before stated. This fact raises a strong probability, therefore, that the grant was not executed at Monterey in the ordinary performance of his official duties by the governor; for if it had been, it is in the highest degree probable, that a record would have been made. The law required grants of the kind to be written upon habilitated paper for that year, for which a tax of eight dollars was paid. This grant was not on the required habilitated paper. By not using that kind of paper, the government was defrauded, by its own chief executive officer, of eight dollars of its revenue, and no reason is assigned for this action. Had the grant been made at Monterey, there would have been habilitated paper for the purpose, and it is highly probable, that it would have been used. It was not customary, or lawful to write the final grant on the other side of the same half sheet of paper containing the provisional concession, as this was written. And there does not appear to be any unquestioned grant in which this was done. This grant was, also, in the governor's own handwriting, when the universal practice in regard to unquestionably genuine grants, was for the grant to be written by the chief clerk, who, in this case, was Francisco Arce. There are few, if any instances of acknowledged genuine grants, where the grant is in the handwriting of the governor, and none where it is, also, on the back of the concession. The grant is not attested by the secretary, and it was the universal custom for a grant to be so attested. Had this grant been executed at Monterey, at the time alleged, these officials would all have been there, and it is in the highest degree probable, that the grant would have been on habilitated paper, as the law required, in the handwriting of the chief clerk, and that its execution would have been attested by the secretary, and a record made of it. All these irregularities render it in the highest degree improbable, that the grant was executed at Monterey, or at the time it bears date.

On the other hand Alvarado was a brother-in-law of Castro, and in 1850, when this grant was first brought to light, as well as the other grant to Yerba Buena Island, to another brother-in-law, they lived near each other in Contro Costa county, not far from Benicia, where its exist-

ence was first disclosed; and the wife of Frisbie, in whose hands it was first found, claiming to be a grantee of Castro, was a niece of Castro. It seems to have been thus far quite a family affair. If the grant was executed in 1850, at San Pablo, this would account for the irregularities found. It would not be on habilitated paper for the year 1841, as Alvarado, at that time, and place, would not be likely to have that kind of paper. So, also, for similar reasons, the fact of the grant being upon the other side of the same sheet containing the provisional concession, and the fact of its being in the handwriting of Alvarado, and its execution not being attested by the secretary would be accounted for, as he had no chief clerk in 1850, to write the grant, or secretary to attest its execution. And in 1850, Alvarado would not be likely to have any paper of the kind used by Mexican officials in 1840-41, similar to that upon which the petition, *informe* and permission to occupy were written. Hence the necessity of writing the grant upon paper already appropriated on one side.

The alleged grant contains this sentence: "I have in decree of this day declared, as I do by these presents declare, Don Victor Castro owner in fee," etc. The words "*I do by these presents*," is a phrase peculiar to conveyances and contracts in common-law countries, and finds no place in documents of the kind executed under the civil law. The same may be said of the repetition in different terms. We are not aware that the phrase can be found in any document conceded to be genuine, executed by Mexican officials before the transfer of California to the United States. Hopkins does not remember an instance of the kind. It was unknown to the Mexican system and forms of granting. But after the Americans came here, the common-law forms at once, came into use, and by 1850, their use had become general. Alvarado had, doubtless, between 1846 and 1850, by his association, and dealings with Americans, become familiar with the phraseology of these contracts and conveyances. It is, only, on the hypothesis that this grant was executed in 1850, after he had become familiar with our forms, and not in 1841, that the use of this phrase in the grant can be satisfactorily accounted for. However unimportant the phrase in this grant might of itself alone, seem at first blush, it becomes extremely significant, when considered with reference to the surrounding circumstances. It adds another strong intrinsic probability to the theory, that this grant was executed in 1850, and antedated.

The introductory phrase in the grant, "Conformably with the powers conferred upon me by the supreme government," is not, so far as we are aware, found in any unquestioned grant, professedly made under the colonization laws. It must have been made, therefore, after Alvarado had forgotten the formula, or else, he intended to make the grant under the authority of the "central government," conferred on him in 1838, to grant "desert islands, adjacent to the department," in which case, it is, absolutely, void, as we have already seen.

Mr. R. C. Hopkins, Mr. Forbes, and Mr. Hickock were examined as experts upon the signatures, and handwriting of Alvarado at different

periods of his life, with a view of throwing light upon the question, as to the time when this grant was, in fact, executed. Their examination was very thorough, and minute, and a comparison was made between many documents in the Mexican archieves. It would serve no good purpose to discuss all the *minutia* of their evidence *pro* and *con*, and we shall confine ourselves to stating general results.

Mr. Hopkins was keeper of the Mexican archives for almost a quarter of a century, during which time he made the matter of the genuineness of these classes of documents a special study. He thereby became as thoroughly master of the subject, as any man can reasonably expect to become,—certainly, more thoroughly acquainted with the records, and their characteristics than any other man, who has ever had anything to do with them. His services have been rendered, at some stage of the proceedings, in a similar character, in most of the cases of grants presented for confirmation to the land commissioner; and he has done much to bring to light the frauds in rejected cases,—not to say supposed frauds, that existed in some cases confirmed in the early history of the cases presented to the land commissioners. Much reliance has, always, been justly placed by the courts, and counsel on his judgment and skill, as an expert, in these matters. Mr. Forbes has been the keeper of the archives since Mr. Hopkins retired, and he has had considerable experience and familiarity with the archives. Mr. Hickock is, also, an expert of recognized ability in handwriting, and, he is often called in such matters. The general result of the testimony of these experts, is, that the handwriting of Alvarado varied at different periods of his life, and, that, there are three periods in which there is quite a marked difference,—that there were three distinct modes of forming the " B " in his signature, Juan B. Alvarado, as well as variations in his general handwriting; one of them being generally used after 1843 or 4 and down to 1850, and since; that the " B " found in the signature of the grant in question, was of the form belonging to the last period, that there were but five instances of grants purporting to be made about, and near the date found in the grant in question, in which the form of the " B " used in the disputed grant is found, and that the genuineness of all these but one is questionable, standing in this particular, upon the same footing with the grant in question; that the handwriting of Alvarado, in which the grant in question is written, also, resembles the handwriting of Alvarado at the later period after 1844; that this grant and some other disputed grants bearing nearly the same date, are written with a steel pen; and Hopkins testifies, that he had found no instance of a document of unquestionable authenticity, written with a steel pen in the archives of date prior to 1844, in which year there is one in the handwriting of Hinckley, an American, and he infers, that steel pens were not in use in California, especially by Mexicans, prior to that date. After a careful consideration of the documents in the archives, the experts are of opinion, that this grant must have been written and executed, not at the time it bears date, but at some period subsequent to the acquisition of California.

Mr. Hopkins says, this is not a conclusion reached by him, merely, upon an examination for the present occasion; that his attention was directed to this grant many years ago; that he studied the question, carefully, and thoroughly examined the archives at his leisure, and, that, his conclusion is the result of an examination and consideration extending over a period of many years. That his*present examination was only to refresh his memory by going over the various documents again. He is decidedly, of opinion, that the grant was not written, or executed, till after the transfer of California to the United States. On the trial in this court of the *Irwin Case* to recover of the United States the marsh lands adjoining Mare island, then claimed by the government as being a portion of Mare island, the attorneys of the United States, thought it their duty to maintain the validity of this grant 'to Castro, as that was the only ground upon which their hope of recovery rested. On that occasion, Mr. Hopkins was called, and examined by the plaintiff as an expert *against* the United States, to overthrow the grant, as he is now called by the United States for the same purpose. His testimony, then, corresponded fully with that now given by him. There was no opposing expert testimony introduced in this case. After an examination of the various documents in the handwriting and the signature of Alvarado, introduced in evidence, in the light of the testimony of the experts, it appears to us, therefrom, to be highly probable, that this grant was written and executed in the later period of Alvarado's life, and as late as 1850. This adds another probability against the genuineness of this grant.

One other circumstance we feel called upon to notice. On the cross-examination of Castro upon his testimony, that he had made a conveyance to Bryant in 1847, which it is claimed is lost, in order to shake his credibility, the witness was asked whether he had not, subsequently, to to his alleged conveyance to Bryant, made a conveyance of the same island to other parties. He admitted that he had, to Chase and Sackman. He said that he was himself, then, ignorant; that these parties represented to him that they could recover the land, and that, if he would convey to them, they would bear the expense, recover the property, and give him one-half, and relying upon their representations, he had made a conveyance to them. These parties do not appear to have any connection with either of the other adverse claimants under Castro, and nothing more is heard of them in the case. Castro was then asked if he had not made still another conveyance, to which he replied that he had not. In order to involve him in a contradiction, he was shown a signature upon a deed, in which there was no "r" in the word "Victor," purporting to be his, and asked if that was his signature, to which, after examination, he answered it was not; and, upon being pressed, said that he neither signed that document, nor authorized anybody else to sign it for him, and persisted in this positive denial. The deed was not offered, but plaintiffs' counsel insisted that it should be retained and identified. It was not then apparent for what purpose. The instrument was identified, and it proved to be the conveyance of

Mare island from Castro and wife to Frisbie and Simmons, the first link in the chain of the derivative title from Castro to the petitioners for the confirmation of their claim to Mare island before the land commissioners, and which the plaintiffs, after offering further proof that it was a forgery, put in evidence at a subsequent stage of the proceedings—when they came to rebuttal—at the same time denying its genuineness, to show that no title in fact passed to the petitioners and through them to the United States, and that the United States claimed under it.

In the early stages of the argument of plaintiffs' counsel it was earnestly pressed upon us, that this deed was proved, beyond the possibility of doubt, by positive uncontradicted testimony to be a forgery. Upon the view we take, we do not deem it necessary to decide whether it is a forgery or not; and we are unwilling to decide it, unnecessarily, upon so limited and partial a presentation of the testimony, collaterally, in the absence of parties necessarily implicated in the charge. But plaintiffs earnestly insist, that it is a forgery, and present points on this theory that require notice; and if we were compelled to decide the question on the testimony as it now stands, it would be difficult to arrive at a different conclusion. If it be a forgery and fraud, as they insist, then, it seems to us, that a strong additional inference arises from this fact and the attendant circumstances, that the alleged grant from Alvarado to Castro is also a fraud. The perpetrators of this forgery and fraud, if such it be, whoever they may be, have, certainly, by this act shown themselves capable of being parties, or accessories to the making of the fraudulent grant from Alvarado to Castro, which was as necessary to form the foundation of the claim for confirmation presented by the petitioners, as the first conveyance in the derivative title from Castro to Frisbie and Simmons.

The alleged fraudulent conveyance was, necessarily, made in the same interests, whatever those interests were, as those seeking to avail themselves of the benefit of the alleged grant from Alvarado to Castro. The conveyance bears date May 28, 1850, about the time the alleged grant from Alvarado, for the first time, came to light in the hands of Frisbie. The parties to these transactions were, doubtless, intimate in their social relations, as, according to the testimony of Castro, Alvarado was his brother-in-law, and the wife of one of the grantees in this deed, his niece. If at this time, no final grant had been made, then, there was an absolute necessity for making a fraudulent one, in order to secure a confirmation of the claim to Mare island. But in view of the evidence, as to Castro's prior transactions, it seems singular, that there should be any necessity for forging a conveyance from him. However this may be, in view of the surrounding circumstances, if this apparent conveyance of Castro is a forgery, it is difficult to resist the conclusion, that the preceding and far more important document, is, also, a fraud. The maxim, *noscitur a sociis* seems particularly applicable to the grant of Alvarado; and the principal of the maxim relating to false testimony, *falsus in uno, falsus in omnibus*, would, also, seem to be equally applicable.

Upon a consideration of the whole case, we cannot resist the conclusion, that the alleged grant from Alvarado to Castro was not made or ex-

ecuted, till some time in 1850, long after the transfer of California to the United States; and; that; it is fraudulent and void; and we so find.

· But, plaintiffs insist, that this question is not now open to consideration; that the claim has been confirmed in the mode provided for confirmation of such claims in proceedings to which the United States were parties, and that they are thereby estopped from averring the contrary; also, that the United States claim title under this grant, and are, consequently, estopped from denying its genuineness now. We cannot assent to either of these propositions. The plaintiffs were not parties to those proceedings, and not in privity with any party to them. The question was, entirely, between the United States and the petitioners, who were strangers to plaintiffs. It only settled rights between them. And the act of 1851 expressly provides, that the decree of confirmation shall be conclusive "between the United States and claimants, only." 9 St. 634, § 15. Besides, before the order for confirmation, the United States had purchased in any adverse claim, that the petitioners had—compromised the adverse claim, so that the confirmation, under the authorities cited,ʹ would inure to the benefit of the United States. It had therefore, become a matter of indifference to the United States, whether the claim should be confirmed or rejected, as in one case the confirmation inured to its benefit; and in the other, the legal title then in the United States, continued to remain in them, as before, without even any adverse outstanding equity. It was upon this idea, expressed by the United States attorney, at the time, that, he stated, that there was no further objection to a confirmation; upon which statement, the order for a decree of confirmation was made. And it was, doubtless, owing to this indifference, as to whether the confirmation was now made or not, that there was a neglect to follow up the order for a decree by the entry of a final decree, while final decrees were entered in all but two, of the other cases in which final decrees were ordered at the same time, and embraced in the same order. Besides the confirmation has not reached the stage yet, where it has become *res adjudicata*, and can operate as an estoppel. There is as yet, no final decree. There is, as we have before seen, only an order for a decree. The case is still liable to be opened, and the whole proceeding dismissed and abandoned. The confirmation is neither final as to the subject matter, nor even final as to the court that rendered it, so as to render it appealable. The matters are, therefore, still *sub judice.* Until the decree becomes final as to the subject-matter, it is not *res adjudicata,* and cannot operate by way of estoppel. *Sharon* v. *Hill,* 26 Fed. Rep. 344, 388, 389.

As to the estoppel insisted upon by claiming title under the alleged grant to Castro, and subsequent conveyances to the petitioners in the proceedings for confirmation. The defendant did not, on the trial of this case, rely on, or even present those grants, conveyances and proceedings, but altogether repudiated them. It was the plaintiffs who, against the objection of defendant, introduced these proceedings and conveyances, while denying the genuineness of some of them, and sought to force the repudiated position upon defendant. Besides, as to strangers, a party

is not estopped from denying the validity of an adverse title purchased in order to secure his peace. It is often cheaper, and better, to purchase in a void adverse claim than to litigate it. Any party is at liberty to buy his peace without prejudicing his own title already held. *Cannon* v. *Stockmon*, 36 Cal. 538.

Upon the views expressed, there must be findings and a judgment for defendant, on the grounds indicated, in this opinion, and it is so ordered.